**In re FAMILY HEALTH SERVICES, INC., et al., Debtors.**

**MAXICARE HEALTH PLANS, INC., a California corporation; et al., Plaintiffs,**

**v.**

**CENTINELA MAMMOTH HOSPITAL, a California corporation, and Centinela Mammoth Radiology Medical Group, Antelope Valley Hospital Medical Center, Lompoc Hospital District, Los Robles Radiology Associates, and Melvin Greenblatt, M.D., Individually and as Representatives of a Defendant Class, Defendants.**

**Bankruptcy Nos. SA89–01549JW, SA89–01550JW to SA89–01594JW.**

**Adv. No. SA89–0510JW.**

United States Bankruptcy Court, C.D. California.

Sept. 22, 1989.

---

938

See also, Bkrtcy., 104 B.R. 279, Bkrtcy., 101 B.R. 618.

Peter Wolfson, Arthur H. Ruegger, and Mark Segall, Myerson & Kuhn, Los Angeles, Cal., for debtors.

George Juarez and James Stang, Pachulski, Stang & Ziehl, Los Angeles, Cal., for Antelope Valley Hosp. Medical Center.

Alvan M. Joffe, Inglewood, Cal., for Centinela Mammoth Hosp.

Pamela Roberts, King, Weiser, Edelman & Bazar, Los Angeles, Cal., for Los Robles Radiology Associates.

Marc Cohen and Norman Levine, Greenberg, Glusker, Fields, Claman & Machtinger, Los Angeles, Cal., for American Medical Ass'n.

Madison S. Spach, Jr., Voss, Cook, Casselberry & Thiel, Newport Beach, Cal., for Duke University Medical Center.

Elisabeth A. Squeglia, Bricker & Eckler, Columbus, Ohio, for Ohio Hosp. Ass'n.

Frank Uribie, Ellingsen, Christensen & Van Hall, Los Angeles, Cal., for San Antonio Community Hosp.

Joel Samuels, Sidley & Austin, Los Angeles, Cal., for Official Bank–Bondholders' Committee.

David Gill, Danning, Gill, Gould, Diamond & Spector, Los Angeles, Cal., for Official Creditors' Committee.

## MEMORANDUM OF DECISION

JOHN J. WILSON, Bankruptcy Judge.

This matter comes before the court on the motion of 37 Maxicare debtors for a preliminary injunction prohibiting a class of defendants from taking any acts to collect charges from Maxicare members or their employers for medical services rendered prior to the filing of the Maxicare bankruptcy petitions.

## BACKGROUND

Family Health Services, Inc. and 45 related corporations filed for relief under Chapter 11 of the Bankruptcy Code on March 15, 1989. Subsequently, two affiliated corporations also filed Chapter 11 petitions. The 48 cases were consolidated for joint administration under Family Health Services, Inc., however, the debtors are commonly and collectively known as "Maxicare." The plaintiffs and moving parties are 37 of the 48 Maxicare debtors.

According to the schedules, assets of Maxicare total 668 million dollars and liabilities are 800 million dollars. It appears that there are in excess of 100,000 creditors plus an unknown number of the one million current and former members of Maxicare health plans who may have claims. Maxicare operates a national network of health maintenance organizations (HMOs) which furnish health care services to approxi-

mately 440,000 people.[1] Plan members (also called enrollees) pay a fixed monthly fee, usually through their employer, known as a subscriber, and are eligible for all covered routine and emergency medical services.

Many hospitals, doctors, and individual health care professionals have express contracts with Maxicare to provide services to plan members under two fee arrangements. A provider agrees either to deliver medical care for a fixed monthly charge, a "capitation fee," or to render services on a discounted fee for service basis. Collectively, these health care providers are referred to as "contract providers," which include the "primary care physician" who has overall responsibility for the individual's medical care.

Maxicare does not arrange contracts with every health care provider required to serve the needs of its members. The necessity for emergency services, for example, cannot be predicted, therefore, emergency care providers rarely have contracts with Maxicare. Also, primary care physicians refer patients to hospitals, physicians, and other medical professionals for specialized care. Known as "referral providers," these providers normally have no contracts with Maxicare. Thus, the non-contract provider group includes emergency care providers, referral providers and other health care providers which serve Maxicare members but have no prearranged service agreement with Maxicare.

Maxicare seeks a restraining order prohibiting all non-contract providers from collecting unpaid medical bills directly from Maxicare members. Since contract providers are prohibited from directly billing HMO members by the terms of their contracts as well as the provisions of some state laws,[2] the debtor's request is narrow-

1. Peter J. Ratican, president and CEO of Maxicare, testified that almost one million people were enrolled in Maxicare at the end of 1988. He estimated that Maxicare had approximately 600,000 members when the bankruptcy cases were filed and placed current enrollment at 440,000.

2. California law provides that "Every contract between a plan and a provider of health care services shall be in writing, and shall set forth that in the event the plan fails to pay for health care services as set forth in the subscriber contract, the subscriber or enrollee shall not be liable to the provider for any sums owed by the

ly focused on providers which have no written agreement with Maxicare.

The adversary complaint was filed on May 1, 1989. Along with the complaint, the debtor filed an Application for Order Shortening Time For Hearing on Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction. The court did not grant a temporary restraining order and set a hearing on the preliminary injunction for June 5, 1989. At that hearing, the court scheduled a status conference and opening statements for July 17, 1989. On June 28, 1989, debtor filed a Notice of Motion for Supplemental Order Pursuant to 11 U.S.C. §§ 105(a) and 362(a) Restraining Referral/Emergency Providers and Memorandum of Points and Authorities in Support thereof, which was also set for hearing on July 17, 1989.

The named plaintiffs and moving parties are 37 of the 48 Maxicare debtors. The complaint named six defendants, individually and as representatives of a defendant class. At the commencement of the trial the court noted that the complaint did not comply with the procedure set out in Federal Rule of Civil Procedure 23 and apparently the debtor abandoned its attempt to certify a class.

Four defendants, AVHMC, Centinela Mammoth Hospital, Los Robles Radiology Associates, and Melvin Greenblatt, M.D., were served with an alias summons and complaint on May 31, 1989. The debtor settled with Centinela Mammoth Radiology Medical Group, Lompoc Hospital District, and Melvin Greenblatt, M.D., pursuant to stipulations entered June 7, 1989, wherein these three defendants agreed to the issuance of a preliminary injunction prohibiting collection of prepetition medical bills from Maxicare members or subscribers and the debtor dismissed the adversary proceeding as to those parties.

The Creditors' Committee filed comments supporting the debtor's position. Opposition to the debtor's Motion for Preliminary Injunction was filed by named defendants Antelope Valley Hospital Medical Center (AVHMC) and Centinela Mammoth Hospital. Los Robles Radiology Associates filed their Answer in the adversary proceeding and submitted the matter to the court for a decision based on the pleadings. Though not named as defendants, American Dental Association, American Medical Association, Ohio Hospital Association, and San Antonio Community Hospital filed opposition to the debtor's Motion.

The trial began on July 17, 1989, continued on July 20, July 21, July 24, and was completed on August 7, 1989. The court heard closing arguments on September 12, 1989. The debtor appeared by Peter Wolfson, Mark Segall and Arthur Ruegger of Myerson and Kuhn, AVHMC appeared by George Juarez and James Stang of Pachulski Stang & Ziehl, Centinela Mammoth Hospital appeared by Alvan Joffe, Los Robles Radiology Associates appeared by Pamela Roberts of King Weiser Edelman & Bazar, American Medical Association appeared by Marc Cohen and Norman Levine of Greenberg Glusker Fields Claman & Machtinger, Duke University Medical Center appeared by Madison Spach of Voss & Cook, Ohio Hospital Association appeared by Elisabeth Squeglia of Bricker & Eckler, San Antonio Community Hospital appeared by Frank Uribie of Ellingsen Christensen & Van Hall, Creditors' Committee appeared by David Gill of Danning Gill Gould Diamond & Spector, and the Bank–Bondholders' Committee appeared by Joel Samuels of Sidley & Austin.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1334(a), (d); 28 U.S.C. § 157(b)(2)(G), and General Order No. 266 of the United States District Court for the Central District of California.

## DISCUSSION

Maxicare Health Plan members usually seek medical treatment by first contacting their "primary care physician" who is under contract with Maxicare. Often the primary care physician refers the Maxicare member to a hospital, physician, or other

plan." Cal.Health & Safety Code § 1379(a) (West 1979).

medical service provider who is not under contract with Maxicare. Under the Maxicare Health Plan, if Maxicare fails to pay a contract provider for authorized services, the member is not liable to the provider for any sums owed by Maxicare. However, in the event that Maxicare fails to pay a non-contract provider, the member may be liable to the non-contract provider for the cost of services. (Exhibit A, page 19). The contract provider assumes the risk of non-payment by Maxicare whereas the non-contract provider may retain rights to seek payment directly from the member.

Historically, members seeking medical services from non-contract providers sign forms in which they agree to be responsible for payment for all services.[3] Prior to bankruptcy the usual practice was for the provider to bill Maxicare for services rendered to the member and Maxicare processed and paid those claims in the ordinary course of its business. Often the provider furnished courtesy copies of its bills to the member but usually did not seek payment from anyone other than Maxicare. Defendant AVHMC was a contract provider from April 1, 1986 until it terminated its agreement with Maxicare effective February 29, 1988, and followed this procedure.[4]

When Maxicare filed for Chapter 11 relief the procedure for paying claims underwent a radical change. Maxicare could no longer pay any prepetition claim nor could the provider seek payment from Maxicare because of the imposition of the automatic stay pursuant to 11 U.S.Code section 362. While contract providers had bargained away their right to seek payment from members, the non-contract providers were under no such contractual prohibition. Accordingly, non-contract providers, realizing that they could not expect payment from

Maxicare in the ordinary course, commenced collection efforts directly against Maxicare members. Members were understandably irate at this turn of events because they had signed up for a plan that, for the most part, promised them medical services at no cost beyond their membership payment. Members complained to their employers who had contracts (subscriber agreements) with Maxicare and registered their complaints with their Maxicare representative.

According to Maxicare, direct billing of its members substantially interferes with its ongoing operations and severely impairs its ability to successfully reorganize. This prompted Maxicare to commence an adversary proceeding and request a temporary restraining order against all non-contract providers. The court refused to issue a TRO and set the matter for trial on the complaint for a preliminary injunction. At the conclusion of the trial the court announced it would issue a preliminary injunction for a limited period of time with certain conditions, as more particularly set forth in this opinion.

In support of the requested relief Maxicare relied on several theories. First, it asserted that the prior course of conduct between Maxicare and the non-contract providers wherein providers routinely billed and were paid by Maxicare resulted in an implied contract releasing the members from liability to the providers. At the conclusion of plaintiff's evidence, the court ruled against the debtor on the ground that there was insufficient evidence to support a finding of an implied contract. Bankr. Rule 7041; Fed.R.Civ.P. 41(b).

The debtor next asserted that, at least as to California providers, direct billing of members was prohibited by the Knox–Keene Act. Cal.Health & Safety Code

---

**3.** It was argued that such provisions constitute *contracts of adhesion but a finding to that effect* is beyond the scope of this decision. For purposes of this ruling the Court assumes, without deciding, that a member's liability for payment to non-contract providers is a question of state law and contract law to be determined on a case by case basis.

**4.** "HOSPITAL [AVHMC] agrees not to maintain any action at law against a MEMBER [of Maxicare] to collect sums that are owed by MAX[ICARE] to the HOSPITAL [AVHMC] under the terms of this Agreement. Decl. of Mathew Abraham Ex. C., p. 13, 3.2(1). (Hospital Agreement between AVHMC and Maxicare, effective April 1, 1986 through February 29, 1988.).

**942**

§§ 1340 to 1399.63 (West 1979 & Supp. 1989). The court does not reach this issue because there are independent grounds under the Bankruptcy Code for issuing a preliminary injunction.

The debtor's third contention is that the automatic stay under Bankruptcy Code section 362 prohibits direct collection efforts against the non-debtor members and, finally, the debtor urges the court to issue a preliminary injunction pursuant to Bankruptcy Code section 105. For the reasons set forth herein the court will issue a limited and conditional preliminary injunction pursuant to Bankruptcy Code sections 105 and 362.

### THE SECTION 362 AUTOMATIC STAY

 Section 362(a)(1) operates as a stay of the commencement or continuation of any action that was or could have been filed against the debtor before the petition or to recover a prepetition claim against the debtor.[5] This section generally applies to stay actions only against a debtor, however, when "unusual circumstances" exist 362(a)(1) may be used to stay the actions of a non-debtor party. *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 999 (4th Cir. 1986), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). In *Robins,* the debtor's filing of a Chapter 11 petition stayed all lawsuits against Robins, the manufacturer of a contraceptive device known as the Dalkon Shield. *Id.* at 996. However, a number of plaintiffs sought to sever their actions against Robins and proceed against co-defendants, who were entitled to indemnification from Robins. *Id.* It was this very situation that the Fourth Circuit described as "unusual circumstances." *Id.* at 999. According to the court's analysis in *Robins* any suit against a third party who is entitled to absolute indemnity by the debtor on any judgment rendered against that third party is the proper subject for application or extension of the statutory stay. *Id.* This "identity of inter-

ests" provides the special or "unusual circumstances" which justify an order that stays proceedings against non-debtor parties.

The collection efforts of non-contract providers against non-debtor defendants in the case at bench parallel the lawsuits of personal injury claimants against co-defendants of Robins. The plaintiffs in both cases are creditors with claims against the debtor and other defendants. A judgment against a non-debtor defendant will trigger a claim against the debtor for indemnification, thus, the debtor is the "real party defendant."

The court in *Robins* found three separate grounds for issuing a preliminary injunction against non-debtor parties. First, it determined that Bankruptcy Code section 362(a)(1) "stays actions against the debtor and arguably against those whose interests are so intimately intertwined with those of the debtor that the latter may be said to be the real party in interest...." *Id.* at 1001. In *Robins* the non-debtor parties were officers and directors of the director who had an absolute right to indemnification from the debtor if they were held liable to the plaintiffs. Next, the court observed that "[s]ubsection (a)(3) directs stays of any action, *whether against the debtor or third parties,* to obtain possession or to exercise control over property of the debtor." *Id.* The court found that the insurance policies which would be used to satisfy judgments against the non-debtor parties were property of the estate and that "[a]ny action in which the judgment may diminish this 'important asset' is unquestionably subject to a stay under this subsection." *Id.* (citing *In re Johns–Manville Corp.,* 33 B.R. 254, 261 (Bankr.S.D.N.Y.1983)). And finally, the Robins court found an additional ground for issuing the injunction under 11 U.S.Code section 105.

 As previously stated, the court finds that actions against non-debtor mem-

---

**5.** Section 362(a)(1) operates as a stay of "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;" 11 U.S.C. § 362(a)(1).

bers will result in claims against the debtor for reimbursement or indemnification such that the debtor is the real party defendant as that term was used in *Robins*. The court also finds that the debtor's good will and its contracts with subscribers and members are so essential to the survival of the debtor that they constitute property of the estate as that term is defined in Bankruptcy Code section 541(a)(1). Accordingly, direct billing actions against Maxicare members are stayed under Bankruptcy Code section 362(a)(3). *Robins* 788 F.2d at 1001–02; *Johns–Manville*, 33 B.R. at 263.

### SECTION 105 INJUNCTIVE RELIEF

Section 105 of the Bankruptcy Code gives the Bankruptcy Court the power to issue any order that is necessary to enforce any of the provisions of the Bankruptcy Code. 2 *Collier on Bankruptcy* ¶ 105.1 (15th ed. 1988). Clearly, the court may enforce the provisions of section 362, which automatically stay all litigation against the debtor. *In re All Seasons Resorts, Inc.*, 79 B.R. 901 (Bankr.C.D.Cal.1987). Section 105 also endows the court with "ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process whether in a liquidation or in a reorganization case." *In re Johns–Manville Corp.*, 26 B.R. 420, 425 (Bankr.S.D.N.Y.1983) (quoting 2· *Collier on Bankruptcy* ¶ 362.05 (15th ed. 1982). In addition, the court "may issue or extend stays to enjoin a variety of proceedings which will have an adverse impact on the debtor's ability to formulate a Chapter 11 plan." *In re Johns–Manville Corp.*, 40 B.R. 219, 226 (S.D.N.Y.1984). Recently, the Ninth Circuit, while holding that the Bankruptcy Court lacked the power under section 105 to issue a permanent injunction against a non-debtor party, nevertheless affirmed the District Court which had affirmed the Bankruptcy Court's order enjoining enforcement of a state court judgment until the plan was confirmed. *In re American Hardwoods, Inc.*, 885 F.2d 621 (9th Cir.1989); Cf. *In the Matter of Lockard*, 884 F.2d 1171, 1178–79 (9th Cir. 1989). Pursuant to this section the Bankruptcy Court enjoys considerable authority which it may use to protect the general purpose and intent of the Bankruptcy Code as well as to enforce specific Code provisions.

Courts have applied traditional preliminary injunction tests when determining whether to stay actions against non-debtor parties. It has been held that:

> In order for the Court to enjoin a creditor's action against a codebtor or guarantor, the debtor must show: 1) irreparable harm to the bankruptcy estate if the injunction does not issue; 2) strong likelihood of success on the merits; and 3) no harm or minimal harm to the other party or parties. *In Re Otero Mills, Inc.*, 25 Bankr. 1018, 1021 (Bankr.N.M.1982). *In Re Larmar Estates, Inc.*, 5 Bankr. 328, 331 (Bankr.E.D.N.Y.1980); In *Otero Mills* and *Larmar* the courts determined that "likelihood of success on the merits" equates to the probability of a successful plan of reorganization. *Otero Mills*, 25 Bankr. at 1021; *Larmar*, 5 Bankr. at 331.

The Ninth Circuit has stated the standard test to evaluate claims for preliminary injunctive relief as follows:

> Under the first part of this test, the movant must show 1) irreparable injury, 2) probable success on the merits, 3) a balance of hardships that tips in the movant's favor, and 4) that a preliminary injunction is in the public interest. Alternatively, a court may issue an injunction if the moving party demonstrates *either* a combination of probable success on the merits and irreparable injury *or* that serious questions are raised and the balance of hardships tips in his favor.

*F.T.C. v. Evans Products Co.*, 775 F.2d 1084, 1088–89 (9th Cir.1985).

■ The court finds that the debtor has met its burden of proving irreparable harm to the bankruptcy estate if the injunction does not issue. Maxicare's business operations are dependent upon a revenue generating enrollment base. Continued direct billing of Maxicare members prior to annual open enrollment periods that begin in September and October may have a chilling

if not crippling effect on Maxicare's ability to compete for new members and re-enrollments. Peter J. Ratican, chairman and president of Maxicare, estimated current enrollment in Maxicare health plans at 440,000 members. Mr. Ratican testified that the Maxicare network will operate in seven states and requires enrollment of at least 400,000 members to successfully reorganize.[6] Mr. Ratican testified that he has met with several major employer groups representing approximately 100,000 Maxicare enrollees, including Office of Personnel Management, General Motors, United Auto Workers, Public Employees Retirement System, Los Angeles County, Hughes Aircraft, Lockheed and Motorola. These employers reported that direct billing was their major concern and a significant problem. Direct billing of members has caused terminations, withholding of premiums, and off season open enrollment periods according to the testimony of Mr. Ratican and the executive directors of Maxicare plans in Southern California, Indiana, and Illinois. One executive director, Brad Kelly, estimated 30,000 members disenrolled due to direct billing in Southern California alone.

The evidence supports the conclusion that collection actions by non-contract providers directly impact on the ability of the debtor to generate revenues to finance a plan of reorganization. Maxicare has no substantial assets for liquidation and distribution to creditors. The debtor's principal assets are its income generating contracts with employer/subscribers. As a result, loss of enrollment threatens the debtor's existence and may prove fatal to the debtor's ability to reorganize.

The debtor must also show probable success on the merits and, as noted above, in the context of a chapter 11 case this means the probability of a successful plan of reorganization. To a certain extent successful reorganization is always speculative until a plan is confirmed, nevertheless, the court finds that there is a likelihood of success sufficient to justify the issuance of a limited injunction. Maxicare is in the process of

formulating a plan and has already distributed a term sheet to various interested parties. Negotiations are ongoing with the Official Creditors' Committee and the Official Bank–Bondholders' Committee. The debtor and the Committees have retained investment advisors, accounting firms and experienced counsel, all of which are active in negotiations for a plan of reorganization. In the first three months of this case alone professional fees have been incurred of upwards of six million dollars, much of which has been directed toward the formulation of a plan, and the debtor has publicly stated that a plan will be filed by mid-October.

This case, one of the largest chapter 11 cases ever filed, is barely six months old and it would be a monumental achievement for a plan to be confirmed in the near future. Nevertheless, the debtors very existence depends upon its ability to assure members and potential members that it will reorganize promptly thereby justifying enrollment in a Maxicare plan. No evidence was introduced to suggest that reorganization will fail, and the debtor's evidence was sufficient to support a finding that there is a reasonable probability that the debtor can confirm a plan. Accordingly, the debtor has met the second test for a preliminary injunction.

The third test requires the court to balance the hardships to the respective parties and find that this balance tips in the debtor's favor. The three executive directors of Maxicare plans testified that their staff time is dominated by direct billing problems. Sheila Mahoney, a Maxicare in-house attorney, estimated that she and her staff spend 40%–60% of their time attempting to resolve direct billing problems. Much of the debtor's time and attention has been absorbed by member complaints related to direct billing by non-contract providers. Clearly, this ongoing problem has been a considerable drain on the debtor's limited resources and has imposed a hardship on the debtor.

---

**6.** At a hearing on September 11, 1989 debtor's counsel gave a status report which included a current enrollment base of 400,000.

On the other side of the scale there was only limited evidence that an injunction would result in hardship to the defendants. Centinela Mammoth Hospital, a named defendant, appeared by counsel during the trial but presented no evidence. Michael McGinnis, the chief financial officer of AVHMC, testified that AVHMC is a non-profit hospital which generates substantial earnings, enjoys a significant net worth and is current on all its obligations. The only evidence of possible damage to AVHMC was a claim that it may suffer a reduction in bond rating on a bond issue that it anticipates bringing to market at the end of the year. AVHMC, at the direction of its accountants, has classified $950,000 of its prepetition Maxicare accounts receivable as uncollectable and has set up a reserve account in this amount. The alleged effect of this reserve will be the reduction in AVHMC's hoped for bond rating from A to A—. However, according to Mr. McGinnis, changes to the classification of accounts receivable are routinely updated prior to the bond rating review. If in advance of that review the debtor filed a plan of reorganization providing for substantial payments to AVHMC, the receivables would be reclassified to reflect the projected recovery. Thus, the only evidence of damage or hardship introduced by AVHMC was the potential impairment of its bond rating, which may never occur and which will not occur in any event for several months. Accordingly, the court finds that the balance of hardship weighs in favor of the debtor.

The final test for the issuance of a preliminary injunction is that it must be in the public interest. Courts have recognized that in a bankruptcy setting the public interest lies in promoting successful reorganization. *Robins,* 788 F.2d at 1008; *Otero Mills,* 25 B.R. at 1021. The *Robins* court stated that "the unquestioned public interest in promoting a viable reorganization of the debtor can be said to outweigh any contrary hardship to the plaintiffs." *Robins,* 788 F.2d at 1008. In the case at bench claims against the debtor exceed 800 million dollars held by more than 100,000 creditors and parties in interest. If the debtor fails to reorganize, a substantial distribution to creditors is problematic at best. On the other hand, a confirmed plan of reorganization may result in a significant if not total recovery by claimants and, thus, the public interest lies in promoting a successful reorganization.

### THE CLOSED PLANS

At or shortly before the filing of the chapter 11 case Maxicare operated through at least 48 subsidiaries in 15 or more states. Beginning in late 1988 Maxicare embarked on a program of closing down plans in those states where operations were not profitable and that program has continued during the course of the chapter 11 proceeding. During the trial Ohio Hospital Association ("OHA"), an unnamed defendant but purporting to represent numerous non-contract hospital providers in Ohio, strenuously objected to the imposition of any injunction against Ohio providers. Counsel for OHA stated that Maxicare had closed down its Ohio operations and had no intention to reorganize the Ohio subsidiary. The debtor responded that while it had no plans to resume operations in Ohio, the Ohio plan was a division of Maxicare Midwest, a subsidiary corporation that operates HMOs in Illinois and Indiana, and which will be part of the reorganization. The debtor contends that employers are withholding payments to Maxicare in states where the operations have been terminated and that these receivables are necessary for a successful reorganization.

It appears that processing of provider claims can best be handled by Maxicare rather than the individual employees as would be the case if direct billing and collection actions are permitted. It is likely that all prepetition creditors, whether in states where the operations continue or in states where the operations have closed, will be treated equally under Maxicare's plan of reorganization. Furthermore, there is no evidence to suggest that Ohio non-contract providers have been damaged by the imposition of a stay. In view of the fact that the court's preliminary injunction will be of limited duration there is no sound

reason for confining the relief to states where the debtor continues to operate and, therefore, the injunction will be imposed against all non-contract providers.

## DUE PROCESS CONCERNS

This adversary proceeding was commenced against only a few defendants, some of whom settled with the debtor and others who participated only briefly in the trial. The only named and served defendant introducing any evidence was AVHMC. Counsel for the American Medical Association and the Ohio Hospital Association participated at great length during the trial but offered no evidence other than through cross examination of witnesses. They have raised a due process issue concerning the effect of an injunction against hundreds if not thousands of physicians, hospitals, and other providers who have had no notice of this adversary proceeding. This issue cannot be ignored.

To the extent that this court's decision is based on the automatic stay provisions of Bankruptcy Code section 362 no prior notice is required to give effect to the stay. Nevertheless, this court is reluctant to issue a final preliminary injunction against unnamed parties without affording them the opportunity for notice and a hearing. The Fourth Circuit in *Robins* suggested a procedure that could be adapted to this case. There, the court stated that notice could be given to all claimants in the form of a letter stating the terms of a conditional ruling which would become final only after claimants were given a reasonable opportunity to object. A time limit for filing objections might be set and the court could fix a day for a hearing on the objections. The tentative order might then be made final as to any party who failed to enter an objection within the prescribed time. A similar procedure should be adopted here and the court will include such a provision in its preliminary injunction. It should be clear, however, that the court is now issuing a preliminary injunction effective against all non-contract providers subject only to a modification or lifting of the injunction after a duly noticed hearing on objections that may be filed by

any provider. The preliminary injunction will include the method by which the debtor must give notice to all providers against whom the injunction is to be effective, and the procedure for seeking relief from the stay. The limited duration of the stay coupled with an opportunity for notice and a hearing satisfies the requirement of due process.

## THE LIMITED PRELIMINARY INJUNCTION

The record is clear that the debtor is proceeding with uncommon haste in its efforts to formulate a plan of reorganization. The problems faced by Maxicare are enormously complex, far beyond those usually found in significant chapter 11 cases. Competent professionals are devoting thousands of hours to the reorganization of Maxicare in an effort to have a plan on file by mid-October. The nature of the debtor's business is such that if it cannot successfully compete in the marketplace over the coming months, its chances of reorganization are greatly diminished. All of these factors suggest that a confirmed plan is likely to be achieved, if at all, by early 1990. Three and one-half months from mid-October is not an unreasonably lengthy period to complete the plan confirmation process and, having determined that a preliminary injunction should issue for a limited period of time, the court concludes that imposing the stay through January 31, 1990 is reasonable under the circumstances of this case. However, this will be without prejudice to the rights of any party, for good cause shown, after notice and a hearing, to seek an extension or shortening of the injunction period.

## CONCLUSIONS

The court finds that just cause has been shown for the issuance of a preliminary injunction in favor of the debtor (each plaintiff named in the caption to the complaint herein) and against all non-contract providers, wherever situated, pursuant to 11 U.S.Code sections 105(a) and 362(a). The court's findings of fact and conclusions

of law are included in this Memorandum of Decision. A separate Order Granting Preliminary Injunction will be issued forthwith.