In re FIRST ALLIANCE MORTGAGE COMPANY, a California corporation; First Alliance Corporation, a Delaware corporation; and First Alliance Mortgage Company, a Minnesota corporation, Debtors.

Federal Trade Commission; Bob Butterworth, Attorney General of the State of Florida, on behalf of the State of Florida; James E. Ryan, Attorney General of the State of Illinois, on behalf of the State of Illinois; and Tom Reilly, Attorney General of the Commonwealth of Massachusetts, on behalf of the Commonwealth of Massachusetts, Consolidated Appellants,

v.

First Alliance Mortgage Company, et al., Appellees.

Nos. SA CV 00–1231 DOC, SA CV 00–1232 DOC, SA CV 00–1233 DOC, SA CV 01–57 DOC. Bankruptcy Nos. SA 00–12370 LR to SA 00–12373 LR. Adversary No. SA 00–1659 LR.

United States District Court, C.D. California.

April 19, 2001.

See also 263 B.R. 99.

William N. Lobel, Jeffrey M. Reisner, Evan C. Borges, Irell & Manella, Newport Beach, CA, for First Alliance Mortgage Co. of California, First Alliance Corp. of Delaware, First Alliance Mortgage Co. of Minnesota.

Marilyn E. Kerst, John A. Krebs, Julie K. Brof, Jeanne–Marie S. Raymond, Anne M. McCormick, Washington, DC, Barbara Y.K. Chun, Federal Trade Commission, Los Angeles, CA, for Federal Trade Commission.

James Newbold, Thomas James, Mary Welch, Assistant Attorneys General of Illinois, for James E. Ryan, Attorney General and on behalf of Illinois.

Patrick J. Evans, Byron Z. Moldo, Rein Evans & Sestanovich, Los Angeles, CA, Thomas W. Dressler, Dressler & LaVina, Los Angeles, CA, for Bob Butterworth, Attorney General and on behalf of Florida, Tom Reilly, Attorney General and on behalf of Massachusetts.

Karen R. Cordry, National Association of Attorneys General, Washington, DC, for Florida, Illinois, and Massachusetts.

David M. Stern, Klee, Tuchin, Bogdanoff & Stern, Los Angeles, CA, for Creditors' Committee.

Larry W. Gabriel, Mona S. Amer, Pachulski, Stang, Ziehl, Young & Jones, Los Angeles, CA, for Borrowers' Committee.

## *ORDER* REVERSING THE BANKRUPTCY COURT'S ORDER REGARDING THE AUTOMATIC STAY AND PRELIMINARY INJUNCTION

CARTER, District Judge.

This appeal from the bankruptcy court considers whether the automatic stay that takes effect upon a bankruptcy filing bars the Federal Trade Commission ("FTC") and various state attorneys general from commencing or continuing lawsuits against the debtors for violations of consumer protection and fair lending laws. The bankruptcy court below decided that the automatic stay bars such suits. It also decided that, even if the automatic stay does not

bar the suits, the governmental units should be enjoined from prosecuting the suits for a period of 180 days. Concluding that, to the contrary, these actions fall within one of the exceptions to the automatic stay and, further, that the bankruptcy court abused its discretion in enjoining the governmental units from prosecuting the suits, the Court REVERSES the decision of the bankruptcy court.

## I.

## BACKGROUND

First Alliance Mortgage Company of California, First Alliance Corporation of Delaware, and First Alliance Mortgage Company of Minnesota (collectively, "First Alliance")[1] have been in the business of subprime mortgage lending since 1971. First Alliance's customers generally were borrowers who would have had difficulty obtaining loans from conventional sources because of poor credit ratings or insufficient credit histories. The loans, many of which were refinancings by homeowners who had developed significant equity in their homes, typically were secured by the borrowers' first mortgages. As of 1999, First Alliance or affiliated entities were licensed to operate in eighteen states and the District of Columbia and serviced nearly $900 million in loans.

On March 23, 2000, First Alliance filed a voluntary petition for Chapter 11 bankruptcy. It states that it filed for bankruptcy after its board of directors "decided to cease all loan origination activity ..., and to pursue an orderly reorganization and liquidation of [its] assets and liabilities." Appellees' Brief at 12.[2]

As of the petition date, two actions brought by governmental units were already proceeding against First Alliance. Massachusetts had sued First Alliance in Massachusetts state court in October 1998, alleging that First Alliance had violated a Massachusetts consumer protection statute. Massachusetts sought injunctive relief, restitution on behalf of Massachusetts borrowers, rescission of loan contracts, civil penalties, and attorneys' fees and costs. Prior to the petition date, Massachusetts had obtained a preliminary injunction barring First Alliance from originating any loans in Massachusetts in violation of state law and from foreclosing on residential real property in Massachusetts without providing written notice to Massachusetts's Attorney General. Illinois had sued First Alliance in Illinois state court in December 1998, alleging that First Alliance had violated Illinois statutes relating to consumer protection and unfair business practices. Illinois sought injunctive relief, restitution on behalf of Illinois borrowers, rescission of loan contracts, civil penalties, and costs.

After the petition date, two more actions brought by governmental units were filed against First Alliance. In June 2000, Florida sued First Alliance in Florida state court, alleging violations of a Florida unfair business practices statute and common law fraud. Florida named some of First Alliance's officers and employees as defendants in addition to First Alliance. Florida sought injunctive relief, reformation or rescission of loan contracts, civil penalties, "the actual damages sustained by consumers" who were injured by First Alliance's

---

1. The parties sometimes refer to First Alliance as "FAMCO."

2. The FTC notes that First Alliance filed for bankruptcy just days after an article in the *New York Times* and a segment on the televi- sion program "20/20" exposed the company's allegedly deceptive practices and highlighted the number of lawsuits that had been filed against First Alliance in the past several years.

practices, and attorneys' fees and costs. FTC Addendum, Tab 8, Ex. 1 at 27. In October 2000, the FTC sued First Alliance in federal district court, alleging violations of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a) and 53(b), the federal Truth in Lending Act (TILA), 15 U.S.C. § 1607(c), and TILA's implementing Regulation Z, 12 C.F.R. § 226. The FTC sought injunctive relief, rescission of loan contracts, refund of monies paid, disgorgement of ill-gotten gains, any other relief "necessary to prevent unjust enrichment and to redress borrower injury," and costs. FTC Addendum, Tab 8, Ex. 17 at 303.

Florida, Illinois, Massachusetts, and the FTC (collectively, the "governmental units") also filed proofs of claim against First Alliance in the bankruptcy court.[3]

The four governmental units believe that their separate actions against First Alliance are allowed to proceed, notwithstanding the automatic stay that comes into effect upon the filing of a bankruptcy petition, because they are governmental units acting within their police and regulatory power. First Alliance believes that the actions do not fall within the exception for police and regulatory actions.

Prior to this appeal, some of the parties debated this issue in various proceedings in various courts. In May 2000, Massachusetts filed a motion in the bankruptcy court seeking a determination that the automatic stay did not apply to its action.

The bankruptcy court ruled that Massachusetts could proceed in so far as it sought injunctive relief, but not in so far as it sought restitution, civil penalties, attorneys' fees, and costs. The bankruptcy court affirmed this ruling on a motion to reconsider. Massachusetts appealed both rulings to the Bankruptcy Appellate Panel of the Ninth Circuit.[4] In the Illinois action, the attorney general requested a hearing in the Illinois state court regarding the applicability of the regulatory and police powers exception to the stay. In May 2000, the Illinois trial court ruled that Illinois could proceed in so far as it sought injunctive relief and civil penalties, but not in so far as it sought restitution. The court did not state whether Illinois could proceed with its request for rescission. This opinion was reaffirmed without opinion on a motion for reconsideration.[5]

In October 2000, after the FTC filed its complaint against First Alliance in district court, First Alliance filed an adversary proceeding in the bankruptcy court against the FTC, Florida, Illinois, and Massachusetts. The purpose of this adversary proceeding was to resolve the recurring issue of whether the governmental actions fell within the regulatory and police powers exception to the automatic stay. First Alliance requested that the bankruptcy court declare the governmental actions barred by the automatic stay and enforce that stay. It also sued for a permanent injunction under 11 U.S.C. § 105(a) barring the

---

**3.** Other states also filed proofs of claim against First Alliance in the bankruptcy court. These others states have not, either pre- or post-petition, instituted separate actions against First Alliance in other courts. They are not parties to this appeal.

**4.** The Bankruptcy Appellate Panel heard oral argument on March 22, 2001. To this Court's knowledge, that court has not yet issued a ruling.

**5.** The Illinois trial court dismissed some of Illinois's claims on substantive grounds pursuant to a motion to dismiss brought by First Alliance. Illinois appealed this ruling to an Illinois appellate court, which, prior to the entry of the bankruptcy court's injunction on November 13, 2000, had not yet ruled on the merits of the appeal but had ruled that the appeal could proceed notwithstanding the automatic stay. The appeal, like all other litigation at issue here, has been stayed since November 13, 2000.

governmental units from proceeding with their actions outside the bankruptcy court.[6] It simultaneously filed a motion for a preliminary injunction, requesting the bankruptcy court to enjoin the governmental units from proceeding with their separate actions for a period of 180 days.

The bankruptcy court ruled on the motion for a preliminary injunction after a hearing on November 13, 2000. First, it held that the Eleventh Amendment to the United States Constitution and state sovereign immunity did not prevent it from enjoining Florida, Illinois, and Massachusetts (collectively, the "States"). Transcript of Nov. 13, 2000 hearing (hereinafter "Tr.") at 59:10–61:11, *available at* FTC Addendum, Tab 16. Second, the bankruptcy court held that the actions do not fall within the regulatory and police powers exception because First Alliance has stopped all loan origination activity and therefore there is no future harm to prevent and the actions are pecuniary only in nature. *Id.* at 63:1–64:1. To confirm that First Alliance will no longer engage in loan origination, the bankruptcy court enjoined it from so doing. *Id.* at 63:9–17. The bankruptcy court then held that there was no actual need for a preliminary injunction because the automatic stay already barred the governmental actions. *Id.* at 64:2–6. Third, the bankruptcy court held that even if the governmental actions fall within the exception and thus are not barred by the automatic stay, a 180–day preliminary injunction under § 105(a) was warranted on the grounds that allowing the separate actions to proceed would unduly interfere with and burden the debtors' estates be-cause the additional litigation costs were "unnecessary" and would reduce the amount available to be distributed to all creditors and because the actions would divert time and money away from liquidation and plan negotiation. *Id.* at 69:16–70:2; 71:8–15. The bankruptcy court also noted the possibility of inconsistent results, unequal treatment of similar claims, and that collateral estoppel might prevent the bankruptcy court from being the primary entity determining the facts underlying all claims against First Alliance. *Id.* at 70:2–6, 71:15–20. The bankruptcy court made no finding regarding harm to the governmental units.

The governmental units timely appeal from the bankruptcy court's ruling.[7]

## II.

### JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over the appeal of the bankruptcy court's ruling on the automatic stay pursuant to 28 U.S.C. § 158(a)(1). *In re Tucson Estates, Inc.*, 912 F.2d 1162, 1166 (9th Cir.1990) (holding that a ruling on the automatic stay is final for purposes of appeal). In so far as the States' appeal of the bankruptcy court's alternative ruling on the preliminary injunction is based on the Eleventh Amendment, the Court has jurisdiction under § 158(a)(1) because of the collateral order doctrine. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147, 113 S.Ct. 684, 689, 121 L.Ed.2d 605 (1993) (holding that a denial of state sovereign immunity is appealable

---

6. Although the requested injunction is "permanent," it would not bar litigation after the conclusion of the bankruptcy proceeding, as noted by First Alliance at oral argument.

7. The governmental units also moved to withdraw the reference as to their proofs of claim and First Alliance's adversary proceeding seeking the injunction against prosecution of suits outside the bankruptcy court. These motions have been briefed and argued and are all under submission to this Court.

as of right under the collateral order doctrine); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949) (explaining the collateral order doctrine and noting that collateral orders are "final" and are a particular application of the final judgment rule, not an exception to it).

Aside from the Eleventh Amendment aspect of the preliminary injunction, the bankruptcy court's order of preliminary injunction is an interlocutory order. It stays non-bankruptcy litigation for 180 days only and thus contemplates further proceedings to determine whether the stay should continue for longer periods.[8] An interlocutory ruling by a bankruptcy court is appealable only by leave of the reviewing court. *See* 28 U.S.C. § 158(a)(3) (providing that interlocutory orders of bankruptcy courts may be appealed with leave of the reviewing court).[9] Given the significance of the issues presented on this appeal and the harm to the governmental units of not being able to proceed with their actions, the Court GRANTS leave to appeal.[10] The Court therefore has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a)(3). *See In the Matter of Brennan*, 198 B.R. 445, 448 n. 2 (D.N.J. 1996) (granting leave to appeal from a bankruptcy court's order granting a preliminary injunction because the issues presented merited review).

The Court reviews the bankruptcy court's factual findings for clear error and its legal conclusions *de novo*. *In re Tucson Estates*, 912 F.2d at 1166. Thus, the Court reviews the bankruptcy court's decisions on the automatic stay and the Eleventh Amendment *de novo*. *Berg v. Good Samaritan Hosp.*, 198 B.R. 557, 560 (9th Cir. BAP 1996), *aff'd sub. nom In re Berg*, 230 F.3d 1165 (9th Cir.2000). The Court reviews the bankruptcy court's alternative ruling on the preliminary injunction for an abuse of discretion. *In the Matter of Brennan*, 198 B.R. at 448. Courts also review final rulings on § 105(a) injunctions for an abuse of discretion. *See, e.g., EEOC v. Rath Packing Co.*, 787 F.2d 318, 325 (8th Cir.1986).

Findings of fact are clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). An abuse of discretion occurs when a court does not apply the correct preliminary injunction standard, "misapprehend[s] the law with respect to the underlying issues in the litigation," or "rests its conclusions on clearly erroneous findings of fact."

---

**8.** Rulings regarding injunctions related to the automatic stay are considered final for purposes of appeals from the bankruptcy court, and thus presumably a final ruling on a § 105(a) injunction that stays non-bankruptcy litigation would also be final for purposes of appeal. However, the bankruptcy court below has never ruled on the requested permanent § 105(a) injunction.

**9.** Orders of district courts granting or denying injunctions, including preliminary injunctions, may be appealed to the court of appeals as of right. 28 U.S.C. § 1292(a)(1). There does not appear to be a similar provision for

bankruptcy court orders regarding injunctions.

**10.** Although the governmental units did not request leave to appeal the bankruptcy court's ruling on the preliminary injunction, the Court may treat their notice of appeal as a request for leave to appeal. *See* Local Bankruptcy Rule 3.4 ("If a required motion for leave to appeal is not filed but a timely notice of appeal is filed, the notice of appeal shall be deemed a timely motion for leave to appeal.").

*Chalk v. United States Dist. Court,* 840 F.2d 701, 704 (9th Cir.1988).

## III.

### DISCUSSION

Three issues are presented on appeal. First, Florida, Illinois, and Massachusetts argue that as to them, First Alliance's adversary proceeding seeking to enjoin them under § 105(a) violates the Eleventh Amendment. Second, the governmental units argue that their separate actions against First Alliance are not subject to the automatic stay because they fall within the regulatory and police powers exception. Third, the governmental units argue that the bankruptcy court abused its discretion in preliminarily enjoining them from proceeding with these actions for 180 days. Because of the Court's resolution of the second and third issues, it need not reach the issue of the States' sovereign immunity.

### A. The Regulatory and Police Powers Exception to the Automatic Stay

When a debtor files for bankruptcy, all litigation against the debtor in other forums is automatically stayed. 11 U.S.C. § 362(a). Both the continuation or commencement of judicial proceedings and the enforcement of judgments are subject to the stay. *Id.* § 362(a)(1), (2). The purpose of the stay is to centralize all litigation involving the debtor in one court in order to grant the debtor temporary relief from creditors, prevent needless dissipation of the debtor's estate, and·allow for reorganization or liquidation to proceed in the most efficient manner possible. *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 585, (9th Cir.1993); *see also SEC v. Brennan,* 230 F.3d 65, 70 (2d Cir.2000).

In some situations, other interests outweigh these important goals. By statute, Congress has created certain categorical exceptions to the automatic stay. *See* 11 U.S.C. § 362(b) (listing exceptions). For example, criminal proceedings and actions to establish child support orders are exempt from the stay. *Id.* § 362(b)(1), (2)(A)(ii). At issue on this appeal is the regulatory and police powers exception, set forth in § 362(b)(4). Under this exception, the automatic stay does not apply to "the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power."

The purpose of this exception "is to prevent the bankruptcy court from becoming a haven for wrongdoers." *CFTC v. Co Petro Mktg. Group, Inc.,* 700 F.2d 1279, 1283 (9th Cir.1983). In addition, allowing actions that fall within this exception to proceed does not fundamentally contravene the policies behind the automatic stay. Legislative history explains that the primary purpose of the automatic stay is to give the debtor a "breathing spell" from actual collection efforts and ensure equal treatment of creditors. *See* S.Rep. No. 95–989, at 49, 54, 55 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5835–41; *see also In re Compton Corp.,* 90 B.R. 798, 803 & n. 14 (N.D.Tex.1988) (citing this legislative history); *In re Continental Air Lines, Inc.,* 61 B.R. 758, 776 & n. 36 (S.D.Tex.1986) (same). While governmental units proceeding pursuant to the exception may prosecute their actions to judgment, they can enforce or collect money judgments only by bringing a claim for that amount in the bankruptcy proceeding. 11 U.S.C. § 362(b)(5). Thus, the exception does not conflict with the policies behind the automatic stay as much as would an exception allowing enforcement

of money judgments outside the bankruptcy proceeding.

Relevant legislative history sheds some light on the appropriate scope of the regulatory and police powers exception to the automatic stay. When it passed the modern bankruptcy codes in 1973 and 1978, Congress significantly expanded the scope of the automatic stay. *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.,* 474 U.S. 494, 504, 106 S.Ct. 755, 761, 88 L.Ed.2d 859 (1986). When it revised the code in 1978, Congress included the regulatory and police powers exception to the automatic stay as a reaction to decisions of courts that "had stretched the expanded automatic stay to foreclose States' efforts to enforce their antipollution laws." *Id.* Congress "wanted to overrule these interpretations in its 1978 revision," and thus it "expressly" limited the scope of the automatic stay. *Id.* The House Report explained the exception by stating:

> Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.

H.R.Rep. No. 95–595, at 343 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6299; *see also Midlantic,* 474 U.S. at 504, 106 S.Ct. at 761 (quoting the House Report).

■ Courts interpreting the regulatory and police powers exception generally use two tests to determine whether a governmental action falls within the exception: the "pecuniary purpose" test and the "public policy" test. *In re Universal Life Church, Inc.,* 128 F.3d 1294, 1297 (9th Cir.1997). These tests derive from a statement made by Representative Don Edwards, a member of the joint committee resolving differences between the House and Senate versions, who stated that the exception "is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." 124 Cong. Rec. H11,089, *reprinted in* 1978 U.S.C.C.A.N. 6436, 6444–45; *see also EEOC v. McLean Trucking Co.,* 834 F.2d 398, 401 (4th Cir.1987) (quoting Representative Edwards's remarks).

■ The Ninth Circuit explains the two tests as follows:

> Under the pecuniary purpose test, the court determines whether the government action relates primarily to the protection of the government's pecuniary interest in the debtor's property or to matters of public safety and welfare. If the government action is pursued solely to advance a pecuniary interest of the governmental unit, the stay will be imposed.
>
> The public policy test distinguishes between government actions that effectuate public policy and those that adjudicate private rights.

*In re Universal Life Church,* 128 F.3d at 1297 (internal quotation marks and citations omitted). To fall within the exception, a given governmental action must either (1) not be solely pecuniary, or (2) effectuate public policy. *Id.* at 1297. Solely pecuniary actions would include, for example, claims seeking restitution of money wrongfully obtained from the government by a debtor contracting with the government or payment from the debtor for damaging government property. One bankruptcy appellate panel has explained the public policy test as covering agency actions that affect "only the parties immediately involved in the proceedings" and

therefore are similar to any other lawsuit by a private entity against the debtor. *In re Poule*, 91 B.R. 83, 86 (9th Cir. BAP 1988).[11]

First Alliance agrees that actions of the type brought by the governmental units in this case would fall within the regulatory and police powers exception to the extent the actions seek injunctive relief to prevent future harms. However, First Alliance argues that the governmental actions at issue in this case do not fall within the exception first, because there is no risk of future harm and therefore there is no harm that needs to be prevented and second, because the actions seek monetary relief as well as injunctive relief.

### 1. Future Harm

■ Asserting that it "is dead and a carcass or corpse from the standpoint of its assets," Appellees' Brief at 1, First Alliance argues the governmental actions serve no public policy purpose and are only pecuniary because First Alliance has agreed to never again engage in loan origination. The bankruptcy court also has enjoined First Alliance from engaging in loan origination.

There are several problems with First Alliance's argument. Obviously, an alleged wrongdoer's promises to refrain from wrongdoing in the future alone are entitled to little if any weight. Here, First Alliance has presented more than just its own promises; namely, that it is being liquidated in the bankruptcy proceeding

and that the bankruptcy court has enjoined it from engaging in loan origination. Nonetheless, its argument fails.

Initially, the Court notes that it is not at all certain that First Alliance is truly "dead." First Alliance's statements in this regard to the bankruptcy court and to this Court are contradicted by statements made in other contexts. In December 2000, Brian Chisick, First Alliance's founder, filed suit in state court in Washington State, alleging that various statements made by Washington officials had defamed him. In part, his complaint states: "[First Alliance] and Chisick have valid business expectancies in obtaining a license to do business in the state of Michigan, to acquire a bank in California, to continue to do business in the State of Washington and the other states in which [First Alliance] is licensed." Compl. ¶ 33, *Chisick v. Cross*, No. 00–2–02356–0 (Wash.Super. Ct. filed Dec. 26, 2000).[12]

In addition, First Alliance has not addressed the fact that there are potential harms in this case other than loan origination. Allowing First Alliance—or a third-party entity that acquires the loans from First Alliance, whether completely independent or created by those currently affiliated with First Alliance—to continue servicing existing loans on their current and allegedly illegal terms is a potential harm. The governmental actions address this potential harm by seeking relief such as reformation and rescission of contracts.

---

**11.** The Ninth Circuit has stated that an action must meet "either" test. *In re Universal Life Church, Inc.*, 128 F.3d 1294, 1297 (9th Cir. 1997). Viewing the tests as disjunctive perhaps does not always make sense, however. An action that is not solely pecuniary might or might not effectuate public policy, but an action that is solely pecuniary probably does not effectuate public policy. Thus, it may make more sense to think that an action must

be both not solely pecuniary and one that effectuates public policy. In this case, the issue need not be resolved, because the parties agree that the pecuniary purpose test is at issue.

**12.** The Court takes judicial notice of the items submitted by the States, including this complaint.

Also, the governmental actions could bind First Alliance's officers and directors in ways that the bankruptcy proceeding does not. Only the corporate entities are debtors; the officers and directors are not parties to the bankruptcy proceeding. Some of these individuals are named defendants in Florida's action. In addition, injunctive relief obtained in any of the governmental actions against First Alliance itself would run to those in active concert or participation with it and also possibly successors and assigns, thus reaching the individuals even after a demise of First Alliance. The potential need for relief against these individuals is demonstrated by recent actions taken by them. In addition to the lawsuit filed by Brian Chisick in Washington State, within a month of the petition date, Jamie Chisick, the son of Brian Chisick and the former director of First Alliance's Loan By Mail Division, incorporated a new lending company, Mar Vista Financial.[13]

Further, even if there were no evidence of the potential for ongoing harm, the bankruptcy proceeding is not the right forum for making that determination. The Supreme Court has explained that, in considering whether governmental actions fall within the regulatory and police powers exception to the automatic stay, courts should not attempt to evaluate the actions' likelihood of success on the merits. *Board of Governors v. MCorp Fin., Inc.,* 502 U.S. 32, 40, 112 S.Ct. 459, 464, 116 L.Ed.2d 358 (1991) (holding that, when deciding whether a governmental action falls within the exception, courts should not "determine whether the proposed [action] is legitimate" or "scrutinize the validity" of the proposed action). More specifically, other courts have held that it is inappropriate for it to be determined in the bankruptcy proceeding that governmental actions will serve no purpose because the offending behavior has allegedly stopped. *E.g., McLean Trucking,* 834 F.2d at 402 n. 8 (stating that "[t]he bankruptcy court thought non-monetary relief moot because McLean is almost effectively liquidated. The Texas and Tennessee federal district court are now the proper fora in which to determine the propriety of EEOC's non-monetary claims for relief."); *In re Charter First Mortgage, Inc.,* 42 B.R. 380, 384 (Bankr. D.Or.1984) ("The bankruptcy court is not the appropriate forum" in which to decide whether claims for injunctive relief brought by a governmental unit are moot).[14]

Finally, the regulatory and police powers exception is not limited to situations in which future harm must be stopped. It includes actions to fix the amount of damages for past conduct, whether or not that conduct is continuing. *In re Compton,* 90 B.R. at 804 (holding that a Department of Energy action fell within the exception to the automatic stay even though "Compton is now long out of the business of reselling crude oil, i.e.,

---

13. The Court emphasizes that at this point it makes no findings and reaches no conclusions as to whether First Alliance or any of its officers, directors, or other employees have violated any laws or are currently engaging in any wrongful conduct. The Court discusses their current activities only to rebut First Alliance's assertions that there is no chance of any future loan activity occurring.

14. This point answers First Alliance's argument that it is inappropriate for the governmental units to present argument and evidence regarding future harm to this Court, on appeal, that was not presented to the bankruptcy court below. Whether or not this Court should have considered this evidence and argument is basically immaterial, because in any event it is inappropriate for the bankruptcy court to make the decision that there is no risk of future harm.

there is no longer any activity to police or regulate").

■ Thus, in this case there is a risk of future harm, notwithstanding the injunction against loan origination entered by the bankruptcy court, but further, that decision is one that should not be made in the bankruptcy proceeding. When a governmental unit brings a regulatory or police powers action in part to prevent future harm, the court in which that action is brought is the proper forum for deciding whether there is a risk of future harm and the decision should be made on the merits in that action, with reference to the substantive law governing the action, rather than in an abbreviated, preliminary fashion in the bankruptcy proceeding. Finally, the regulatory and police powers exception applies even when it is clear that the offending behavior has stopped, because even an action to fix damages for past misconduct falls within the exception.

### 2. Monetary Relief

First Alliance also argues that the governmental actions do not fall within the regulatory and police powers exception because the actions seek, in part, monetary relief.

#### a. Monetary Relief Other Than Restitution

■ As to all forms of monetary relief other than restitution, First Alliance's position is clearly wrong. In addition to preventing future wrongs, the regulatory and police powers exception to the automatic stay allows governmental units to punish past wrongs. To do so, the governmental units are entitled to seek civil penalties and fines for conduct that violates the law. The "pecuniary purpose" test bars governmental actions solely when the government acts to further a pecuniary

interest alone, not when it seeks, through the imposition of fines or damages or even disgorgement, to punish wrongful conduct.

Legislative history and case law demonstrate this rule. *See* H.R. Rep. No. 95–595, at 343 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6299 (explaining that the regulatory and police powers exception applies to suits "to prevent or stop" a harm and also to suits "attempting to fix damages for violation" of laws); *In re Berg*, 230 F.3d at 1167–68 (allowing a court to impose attorneys' fees as sanctions for unprofessional conduct in litigation on an attorney-debtor); *In re Universal Life Church*, 128 F.3d at 1298 (stating that government actions may fall within the exception even when they seek only money damages); *McLean Trucking*, 834 F.2d at 402 (allowing an EEOC action seeking back wages on behalf of the debtor's employees to proceed); *SEC v. Towers Fin. Corp.*, 205 B.R. 27, 31 (S.D.N.Y.1997) (allowing an SEC action seeking disgorgement from a debtor to proceed).

Even the cases relied upon by First Alliance demonstrate that governmental actions seeking monetary relief as a means of punishing past misconduct fall within the regulatory and police powers exception. In *In re Charter First*, the court allowed a state to proceed with its action against a bankrupt mortgage company seeking, in part, civil penalties for violation of a state consumer protection law. *In re Charter First*, 42 B.R. at 384 ("[I]t is totally appropriate for Washington to proceed in the state court to attempt to obtain an injunction, civil penalties and attorney fees and costs against debtor . . . ."). Similarly, the *In re Poule* court stated that governmental actions "attempting to punish a debtor for fraudulent conduct by assessing civil penalties" fall within the

exception to the automatic stay.[15] *In re Poule,* 91 B.R. at 87.

### b. Restitution

As First Alliance notes, the case law is not consistent as to whether the regulatory and police powers exception allows governmental units to seek restitution on behalf of members of the public who were harmed by a debtor's allegedly wrongful acts. Some district courts and bankruptcy courts have held that restitution on behalf of members of the public does not fall within the regulatory and police powers exception because it determines the private claim of an individual against the debtor. *E.g., In re Dunbar,* 235 B.R. 465, 475 (9th Cir. BAP 1999); *In re Poule,* 91 B.R. at 87; *In re Charter First,* 42 B.R. at 384–85.[16]

■ While the Ninth Circuit has not directly addressed this question, its most recent decisions regarding the scope of the regulatory and police powers exception suggest that it would hold otherwise. First, that restitution has a pecuniary component does not mean it is outside the exception. *See In re Universal Life Church,* 128 F.3d at 1298–99 (holding that when the IRS revoked the charitable tax-exempt status of a debtor corporation, it was acting within the regulatory and police powers exception even though the revocation had the pecuniary consequence of imposing liability on the debtor for unpaid taxes and stating that "most government actions which fall under this exemption have some pecuniary component, particularly those associated with fraud detection"). Second, the Ninth Circuit has held that obtaining monetary judgments falls within the exception even when those judgments will "inure to the benefit of a private party." *In re Berg,* 230 F.3d at 1168. In *In re Berg,* the Ninth Circuit held that a court could impose sanctions consisting of reimbursing the opposing party's attorneys' fees on an attorney who had declared bankruptcy notwithstanding the automatic stay. *Id.* The sanctions were awarded in a case in which the attorney was representing another party, not in the attorney's bankruptcy proceeding. *Id.* at 1167. The court explained that the sanctions award served a deterrence and public policy function notwithstanding the fact that the sanctions were entirely payable to one private entity. *Id.* at 1168.[17]

---

15. One case relied upon by First Alliance supports its view. *See In re Massenzio,* 121 B.R. 688, 691 (Bankr.N.D.N.Y.1990) (stating that the exception does not apply "when the governmental unit seeks to go beyond the abatement of the prohibited or regulated activity and seeks monetary sanctions"). However, the cases cited by the *Massenzio* court do not support the conclusion it draws and, further, both the legislative history of the exception and the vast majority of case law conflict with this conclusion. In addition, *Massenzio* is not binding on this Court.

16. According to First Alliance, courts in Massachusetts and Illinois determined that the actions of those states against First Alliance fell within the exception except in so far as they sought restitution. These determinations are not binding on either the bankruptcy court or this Court. *In re Dunbar,* 235 B.R. 465, 473 (9th Cir. BAP 1999), *aff'd,* 245 F.3d 1058, 1062–64 (9th Cir.2001).

17. At oral argument, counsel for the creditors' committee, which agrees with the position taken by First Alliance on this appeal, argued that *In re Berg* is not *directly* analogous to the restitution claims at issue because a sanctions award is a penalty in a sense. The Court agrees with this point, but because the sanctions award in *In re Berg* was payable to a private party and its amount was determined by the amount of attorneys' fees incurred opposing the wrongful conduct, *In re Berg* still suggests that the Ninth Circuit would hold that the regulatory and police powers exception applies to the restitution claims at issue.

Thus, recent Ninth Circuit precedent suggests that, were the Ninth Circuit to consider the issue directly, it would hold that claims for restitution may proceed under the regulatory and police powers exception. This result is consistent with the results of cases considering governmental actions seeking reimbursement of back wages for a debtor's employees when the debtor violated either labor law or laws prohibiting discrimination. Uniformly, courts, including the Ninth Circuit, have allowed such actions to proceed. *E.g., NLRB v. Continental Hagen Corp.*, 932 F.2d 828, 832–33 (9th Cir.1991); *McLean Trucking*, 834 F.2d at 402–03; *Rath Packing*, 787 F.2d at 324–25; *NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934 (6th Cir.1986); *NLRB v. Evans Plumbing Co.*, 639 F.2d 291 (5th Cir.1981). Back wage claims are allowed to proceed even when the employer-debtor is out of business. *E.g., McLean*, 834 F.2d at 400. The Ninth Circuit stated in *Berg* that it found this reasoning "persuasive." *In re Berg*, 230 F.3d at 1168. Back wage claims seem indistinguishable from the restitution sought from First Alliance by the governmental units in this case.

In addition, at least one district court has allowed a governmental action seeking restitution to proceed. *FTC v. American Standard Credit Sys., Inc.*, 874 F.Supp. 1080, 1083 n. 2, 1089 (C.D.Cal.1994) (allowing the FTC to continue with a separate action against a debtor company and awarding both injunctive relief and restitution).

 Given recent Ninth Circuit authority holding that monetary claims fall within the exception even when they benefit private parties, and given courts' consistent rulings that governmental actions seeking to collect back wages on behalf of private individuals fall within the exception, this Court concludes that the governmental actions at issue on this appeal entirely fall within the regulatory and police powers exception. Regardless of the type of relief they seek, the actions are brought pursuant to the governmental units' regulatory and police powers. Therefore, the Court REVERSES the bankruptcy court's determination that the automatic stay applies to the governmental actions.

**B. Injunctive Relief Under § 105(a)**

In the adversary proceeding from which this appeal arises, First Alliance seeks a permanent injunction barring the governmental units from proceeding with their separate actions outside the bankruptcy proceeding. After filing this adversary proceeding, First Alliance sought a preliminary injunction imposing the same relief, but only for a period of 180 days. As the bankruptcy court noted at the hearing on the preliminary injunction, if the governmental actions did not fall within the regulatory and police powers exception, there would be no need to enjoin the governmental units from proceeding with those actions, because the automatic stay itself would function as an injunction. However, noting that its determination regarding the regulatory and police powers exception might be reversed on appeal, the bankruptcy court also considered whether to enjoin the governmental units from prosecuting their separate actions under the authority of 11 U.S.C. § 105(a). Concluding that even if the actions fall within the regulatory and police powers exception, the balance of hardships tipped in First Alliance's favor, the bankruptcy court entered a preliminary injunction barring prosecution of the actions outside the bankruptcy court for 180 days.

 The parties to this appeal agree that under 11 U.S.C. § 105(a), bankruptcy courts have the legal authority to enjoin prosecution even of governmental

actions that fall within the regulatory and police powers exception. Section 105(a) provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Legislative history and case law suggest that it is not impossible for § 105(a) to be used to enjoin even a regulatory or police powers action. *See* H.R.Rep. No. 95–595, at 342 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6298 ("The effect of the [police powers] exception is not to make the action immune from injunction. The court has ample other powers to stay actions not covered by the automatic stay. Section 105 . . . grants the power to issue [such an injunction]."); *Rath Packing,* 787 F.2d at 325 (stating that bankruptcy courts have the power to enjoin governmental regulatory actions under § 105); *In re State of Missouri v. U.S. Bankruptcy Court,* 647 F.2d 768, 776–77 (8th Cir.1981) (same); *In re Bel Air Chateau Hosp., Inc.,* 611 F.2d 1248, 1251 (9th Cir.1979) ("[S]tays of regulatory proceedings should not be automatic but are appropriate when it is likely that the court proceedings will threaten the estate's assets."); *In re Thomassen,* 15 B.R. 907, 910 (9th Cir. BAP 1981) (same).[18]

 What is at issue on this appeal is whether it was an abuse of discretion for the bankruptcy court to enjoin prosecution of the governmental actions outside the bankruptcy proceeding in the circumstances of this case. The test for enjoining prosecution of a regulatory or police powers action under § 105 is whether the governmental action will "threaten" the assets of the estate. *In re Bel Air Chateau Hosp.,* 611 F.2d at 1251; *In re Tucson Yellow Cab Co.,* 27 B.R. 621, 623 (9th Cir. BAP 1983). While mindful of the bankruptcy court's desire to maximize the assets of the debtors' estate and to evaluate all claims against the debtors in the most efficient manner, the Court concludes that on the facts of this case, the governmental actions do not threaten the assets of the estate enough to justify enjoining the governmental units from proceeding with their separate actions. The bankruptcy court's contrary decision was an abuse of discretion.

 In the Ninth Circuit, a movant requesting a preliminary injunction usually must show (1) a likelihood of success on the merits; (2) irreparable injury; (3) that the balance of hardships tips in the movant's favor; and (4) that the requested injunction is in the public interest. "Alternatively, a court may issue an injunction if the moving party demonstrates either a combination of probable success on the merits and irreparable injury or that seri-

---

**18.** The Court notes that it has some doubts as to whether § 105 truly authorizes an injunction of an otherwise excepted regulatory or police powers action. *See In re 1820–1838 Amsterdam Equities, Inc.,* 191 B.R. 18, 21 (S.D.N.Y.1996) (holding that § 105 was not available to enjoin a regulatory or police powers action); *In re Compton Corp.,* 90 B.R. 798, 806–07 (N.D.Tex.1988) (holding that a § 105 injunction of a DOE action was an abuse of discretion based on the circumstances of the case and also suggesting that § 105 did not give the bankruptcy court power to enjoin a regulatory or police powers action); *In re S.T.R. Corp.,* 66 B.R. 49, 51 (Bankr.N.D.Ohio 1986). The plain language of the bankruptcy code itself certainly does not suggest that § 105 creates an exception to the regulatory and police powers exception. It appears that the sole authority for using § 105 in this way is a few comments in the legislative history. While these comments may be persuasive regarding the intent of Congress, they cannot create statutory language that is not there. However, given that the circuit courts that have addressed the issue squarely have upheld the use of § 105 in such circumstances, including a 1979 Ninth Circuit case, this Court follows the lead of these circuit courts and holds that § 105 may be used to enjoin a regulatory or police powers action.

ous questions are raised and the balance of hardships tips in his favor." *FTC v. Evans Products Co.*, 775 F.2d 1084, 1088–89 (9th Cir.1985).[19] Below, First Alliance, and the bankruptcy court, relied on the balancing test to support the injunction against the governmental units.

### 1. Likelihood of Success on the Merits

To determine whether First Alliance had shown a likelihood of success on the merits, the bankruptcy court looked to the likelihood that First Alliance will be able to confirm a liquidating reorganization plan. Tr. 56:3–14, 70:8–12, 70:21–71:7, 73:25–74:4. The parties dispute whether this was the correct focus.

It appears that the Ninth Circuit has not definitively set forth to what action courts should look when considering this prong of the preliminary injunction test in the context of a § 105(a) injunction. Some courts require the applicant to show a likelihood of success in reorganizing, while others hold that the relevant focus is other actions or proceedings. *Compare Matter of Commonwealth Oil Refining Co., Inc.*, 805 F.2d 1175, 1189–90 (5th Cir.1986) (holding that the relevant focus of the inquiry is the likelihood of success in the non-bankruptcy action) *with In re Family Health Servs., Inc.*, 105 B.R. 937, 943 (Bankr.C.D.Cal. 1989) (equating likelihood of success on the merits with "the probability of a successful plan of reorganization") *with In re Hunt*, 93 B.R. 484, 493 (Bankr.N.D.Tex.1988) (holding that the court should simultaneously consider the movant's likelihood of success on the merits in all relevant proceedings) *with In re Security Gas & Oil, Inc.*, 70 B.R. 786, 793 n. 3 (Bankr.N.D.Cal. 1987) (stating that "the likelihood of success on the merits logically must refer to whether the debtor can show that enforcement of the state laws will unduly interfere with the bankruptcy adjudication").

The Court need not resolve this issue in this case, because even assuming First Alliance showed a likelihood of success on the merits, the preliminary injunction entered by the bankruptcy court fails on other grounds.

### 2. Balance of Hardships

The bankruptcy court concluded that First Alliance would be irreparably harmed if the requested injunction did not issue and that the balance of hardships tipped in First Alliance's favor. Tr. at 69:16–70:6, 71:8–72:20, 73:4–22.

■ As noted above, cases addressing the circumstances in which a bankruptcy court may enjoin prosecution of a regulatory or police powers action under § 105 hold that an action can only be enjoined when it "threatens" the assets of the estate. *In re Bel Air Chateau Hosp.*, 611 F.2d at 1251; *In re Tucson Yellow Cab Co.*, 27 B.R. at 623. Thus, the general standard for enjoining a regulatory or police powers action under § 105 is closely tied to the irreparable injury prong of the test for injunctive relief.

On its own, the "threaten" test is a somewhat vague standard that does not give much guidance as to when a govern-

**19.** A Seventh Circuit case suggests that a bankruptcy court may enjoin other litigation under § 105 without a showing of irreparable harm. *See In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir.1993). The Ninth Circuit has never adopted this standard, and given that the legislative history, upon which the use of § 105 against governmental entities is based, expressly states that § 105 injunctions could be used "under the usual rules for the issuance of injunctions," the Court declines to follow *In re L & S.*, S.Rep. No. 95-989 at 51, 1978 U.S.C.C.A.N. 5787, 5837; H.R.Rep. No. 95-959, at 342 (1977), 1978 U.S.C.C.A.N. 5963, 6298.

mental action may be enjoined under § 105. By forcing the debtor to defend litigation on two fronts, any governmental action will increase the amount expended on legal fees and correspondingly decrease the size of the estate. If this alone constituted a sufficient threat to the estate's assets to justify an injunction, the regulatory and police powers exception to the automatic stay would be, for all practical purposes, a nullity.

 Construing the "threaten" test in light of the principles and polices underlying both the automatic stay and the regulatory and police powers exception to the stay, however, gives the test some definition and sheds light on the circumstances in which § 105 may be used to enjoin a governmental action. The automatic stay advances efficiency and preserves the debtor's estate by decreasing litigation costs. However, these are secondary effects of the automatic stay. Its primary purpose is to stop actual collection or foreclosure efforts, not the determination of liability, and to ensure that similarly situated creditors are treated similarly. *In re Continental Air Lines,* 61 B.R. at 776 & n. 36. Further, by creating the regulatory and police powers exception to the automatic stay, Congress expressly indicated that in most cases the concerns addressed by such actions are more important than the goals of efficiency and maximizing the estate.

 Thus, while bankruptcy courts may have the power under § 105(a) to enjoin governmental actions, such an injunction is only appropriate upon a showing of some harm other than the inefficiency and increased litigation costs that would arise in any such situation. *See generally Penn Terra Ltd. v. Department of Envtl. Res.,* 733 F.2d 267, 273 (3d Cir.1984) (stating that a § 105(a) injunction of a police powers action could be warranted when the action "run[s] so contrary to the policy of the Bankruptcy Code that it should not be permitted"); *In the Matter of Brennan,* 198 B.R. at 450–52 (holding that a § 105(a) injunction of a police powers action "is appropriate only in limited situations where there is a serious conflict between the exercise of state power and the policy of the bankruptcy code" and noting that "injunctions of state regulatory actions are a rare remedy, appropriate only in exigent circumstances where the state regulatory action seriously threatens the bankruptcy process").[20]

A relatively small number of reported cases have considered what types of factual scenarios create a serious enough threat to the bankruptcy process that a regulato-

---

20. *In the Matter of Brennan,* 198 B.R. 445, 451–52 (D.N.J.1996), requires bankruptcy courts to make a "threshold determination" that there is a "serious conflict" between the continuation of the governmental action and the bankruptcy process before considering the four-pronged test for injunctive relief. To the extent *Brennan* sets forth an actual separate rule for § 105 injunctions of governmental actions, the Court does not agree. However, in substance, *Brennan* seems to articulate the same concerns addressed by the Court here; namely, what harms are present and relevant when a § 105 injunction of a governmental action is at issue. Thus, although *Brennan* sets forth a somewhat different sequence of analysis, in substance it seems to reach the same or at least a similar result to that reached by the Court here.

Similarly, the Court agrees with First Alliance that there is no "special" or "heightened" standard for the issuance of § 105 injunctions against governmental units. The issue here, however, is what constitutes irreparable harm and the probability of success on the merits and, as is discussed more fully *infra*, what harms to the governmental units need to be considered. This is not a special or heightened standard, but instead a recognition that different types of harms and burdens may be present when the government, rather than a private litigant, is involved.

ry or police powers action should be enjoined. These cases suggest that a § 105 injunction could be appropriate in two types of situations.

■ First, a governmental action that seeks actual physical control over the assets of the debtor's estate threatens the bankruptcy court's exclusive jurisdiction over the *res* of the debtor's estate and therefore can be enjoined. For example, the Eighth Circuit has upheld an injunction issued by a bankruptcy court against a state regulatory action that sought to obtain physical control over grain stored in warehouses under the debtors' possession. *In re State of Missouri*, 647 F.2d at 776–77. The Eighth Circuit held first that the action did not fall within the police and regulatory powers exception, but it then alternatively held that even if it did, under § 105 the bankruptcy court could enjoin the action. *Id.* The Eighth Circuit explained that a § 105 injunction was warranted because the state regulatory action sought actual physical control over an asset of the debtors' estate and thus interfered with the bankruptcy court's exclusive authority over the physical custody and control of the *res* of the debtors' estate. *Id.; see also In re Neuman*, 71 B.R. 567, 573 (S.D.N.Y.1987) (upholding injunction issued by a bankruptcy court against a state action that would have determined whether a license to operate a nursing home was property of the estate on the grounds that the bankruptcy court had the sole authority to determine what was the property of the estate). It is undisputed that here, the governmental actions being pursued against First Alliance do not threaten the bankruptcy court's physical control over First Alliance's estate.

■ Second, a § 105 injunction of a regulatory or police powers action could be appropriate in other circumstances that severely threaten the integrity of the bankruptcy process. A few courts have enjoined regulatory or police powers actions on the grounds that the costs of defending the actions at issue, both in terms of money spent on lawyers' fees and time taken away from focusing on reorganization, were so high in comparison to the assets of the estate that allowing the actions to continue constituted a "threat" to the estate. *E.g., NLRB v. Superior Forwarding, Inc.*, 762 F.2d 695, 698–99 (8th Cir.1985). Because the bankruptcy court has the obligation to protect and marshal the estate's assets, a severe enough threat to the assets of the estate constitutes a threat to the bankruptcy process.

In addition, one bankruptcy court has used § 105 to enjoin a regulatory or police powers action based not just on a determination that the legal costs and distraction of the debtors' energy would threaten the estate and reorganization, but that such costs could easily be a complete waste. *In re Hunt*, 93 B.R. at 496. In the regulatory action at issue in *Hunt*, the governmental unit sought to use offensive collateral estoppel to defeat the debtors' defenses to the government's claims. *Id.* at 487. The bankruptcy court noted that it was highly doubtful whether offensive collateral estoppel should be used, because the underlying jury verdict was still the subject of numerous post-trial motions and because the trial judge had expressly stated that the case was a close one. *Id.* at 494–95. The bankruptcy court explained that if the government were allowed to use collateral estoppel, and then the underlying judgment was reversed, the debtors would have to seek to overturn any judgment obtained by the government. *Id.* at 493. Thus, not only would all the original legal fees be wasted, additional costs would be incurred in addition.

With these principles in mind, the Court turns to the showing made by First Alli-

ance and the reasons given by the bankruptcy court for the injunction at issue on this appeal. Some of the bankruptcy court's determinations regarding harm to First Alliance were clearly erroneous or legally irrelevant. Others, when balanced against the harm to the governmental units if not allowed to proceed, do not establish enough harm to warrant the issuance of an injunction.

### a. Harm to First Alliance

The bankruptcy court below concluded that irreparable injury had been shown because (1) litigation costs to the estate would be higher if the governmental actions were allowed to proceed, thereby diminishing the amount available for distribution to all creditors; (2) being forced to defend actions outside the bankruptcy court would divert the debtors' "time, energy and human resources" away from negotiating and formulating a plan of liquidation or reorganization; (3) allowing the separate actions to proceed would create a "substantial danger" that findings or determinations made in those other actions would have a collateral estoppel effect on the bankruptcy court, leading to inconsistent results for creditors with similar factual claims against First Alliance; and (4) multiple proceedings would result in unequal treatment of creditors. Tr. at 69:16–70:6; 71:8–72:20.

The Court will consider each of the harms to First Alliance identified by the bankruptcy court.

#### (1) Litigation Costs

■ In general, litigation costs do not constitute irreparable injury. *Rath Packing,* 787 F.2d at 325. A case relied upon by First Alliance states that, however, when those costs are high enough, they may constitute at least an element of irreparable injury. *Superior Forwarding,* 762 F.2d at 699. Here, the bankruptcy court found that it is likely that litigation costs to the estate will generally be higher if the multiple actions are allowed to proceed than if they are not, but the bankruptcy court did not make any specific finding as to how much higher the costs will be.

■ The relevant comparison is not between the costs of defending the actions in multiple forums and the costs of not defending them at all, but rather between defending the actions in multiple forums and defending them in the bankruptcy proceeding. If the actions do not proceed in separate forums, the necessary facts will still need to be established, but just in the bankruptcy court. Motions will be filed and decided and then trials will be held, including calling witnesses from the states at issue. The Court realizes that separate actions will mean less coordination of scheduling and the loss of similar efficiencies that could be gained by trying all the matters in the bankruptcy court. However, the difference is really that if the actions proceed separately, somewhat higher costs will be incurred due to the fact that there is some distance between California and Florida, Illinois, and Massachusetts and that some scheduling efficiencies might be lost.[21]

More significantly, First Alliance presented no evidence other than conclusory declarations of counsel as to what the litigation costs would be if the multiple actions proceed separately. In *Superior Forwarding,* the Eighth Circuit upheld a § 105 injunction against a regulatory or police powers action when the bankruptcy

---

**21.** As the FTC's action against First Alliance is proceeding in this Court, located four floors above the bankruptcy court, presumably it

can be defended without expending particularly significant additional sums of money.

court had specifically found that "trial of the [governmental action] held the possibility of three to four weeks of trial time at an approximate cost of $65,000; and that weeks of preparation time would be necessary for the hearings." *Superior Forwarding*, 762 F.2d at 696. In this case, the parties strenuously dispute how much time will be needed to litigate the governmental actions to their completion. For example, the FTC notes that it may try its claims in its separate action without proving the details of every transaction with every borrower at issue, while First Alliance argues that in the bankruptcy proceeding, each claim must be determined individually. Thus, the bankruptcy court should have made a finding of the difference between the cost of defending the actions separately and defending the actions in the bankruptcy court.[22]

## (2) Diversion of the Debtors' Time, Energy, and Resources

The Court agrees with the bankruptcy court that allowing the governmental actions to proceed separately will distract First Alliance, and its officers and directors, from the bankruptcy proceeding to a certain extent. However, it has been represented to the Court that although no trustee has been appointed to run First Alliance, outside entities, such as Price Waterhouse, are heavily involved in the day-to-day operation of the company. Thus, while this factor is present, it is not particularly significant on the facts of this case.

## (3) Collateral Estoppel and Inconsistent Results

▇▇▇ That allowing the governmental actions to proceed separately will "deprive" the bankruptcy court of the opportunity to determine the amount of the

governmental units' proofs of claim is not a harm to the debtor or a threat to the assets of the estate or the administration of the estate. The bankruptcy code sets forth several situations when a tribunal other than the bankruptcy court should properly liquidate a claim to judgment. *E.g.*, 11 U.S.C. § 362(b) (exceptions to the automatic stay); 28 U.S.C. § 1334(c) (abstention); *id.* § 1452(a) (barring removal of regulatory actions); *id.* § 157(d) (withdrawal of the reference); *see also Nathanson v. NLRB*, 344 U.S. 25, 30, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952) ("The bankruptcy court normally supervises the liquidation of claims. But the rule is not inexorable. A sound discretion may indicate that a particular controversy should be remitted to another tribunal for litigation.") (citations omitted); *In re Continental Air Lines*, 61 B.R. at 764 n. 8 (holding that it was erroneous to equate the bankruptcy court's exclusive physical jurisdiction over the property of the debtor's estate with "a non-existent exclusive jurisdiction 'to hear' proceedings"). Thus, the issue is whether a particular claim is or is not one that should be determined by another tribunal. When a claim is one that may properly be heard before another tribunal, allowing that claim to proceed separately, outside the bankruptcy court, is in fact the appropriate result under the bankruptcy code and does not impair the bankruptcy court's authority or jurisdiction. In addition, if the governmental actions had proceeded to judgment prior to the petition date and the governmental units then, seeking to enforce those judgments, filed proofs of claim, the bankruptcy court would have to allow, disallow, and prioritize the proofs of claims without being able to be the tribu-

---

**22.** The Court is not suggesting that either First Alliance or the bankruptcy court could predict with certainty what the litigation costs would be. However, some finding, even if just an estimate, is necessary.

nal determining, in the first instance, the amount of the judgments.

First Alliance argues that collateral estoppel could only run "one way." Its argument is that if one of the governmental units prevails in a separate action, residents of that unit who have also filed individual proofs of claim in the bankruptcy court will be able to use that judgment to their benefit, but if the governmental unit does not prevail, those residents can still seek to proceed with their proofs of claim. While First Alliance might not be able to defeat the proofs of claim through collateral estoppel technically, the bankruptcy court surely could take the judgment into account when determining the proof of claim.

Finally, that borrowers who are represented by different governmental units, suing for violations of different laws, might end up with different recoveries is not "inconsistent"; it is just an inherent result of a federal system of government.

### (4) Unequal Treatment of Creditors

In actuality there is little or no risk of unequal treatment of creditors, because, as the governmental units agree, while they are allowed by the regulatory and police powers exception to proceed to judgment against the debtor in other forums, they are not allowed to enforce any money judgments against the debtor in any proceeding other than the bankruptcy proceeding. 11 U.S.C. § 362(b)(5).

There also is little or no risk that a single borrower could recover more than once. If one of the governmental units obtains a money judgment against First Alliance, it will have to bring that judgment to the bankruptcy court, which will allow or disallow and prioritize the judgment as it would any other claim. *Id.* When awarding relief, courts in general commonly are able to fashion the relief awarded in such a way as to prevent double recoveries. The Court is confident that in this case, both any courts awarding judgments on these claims and the bankruptcy court authorizing payment on those judgments can structure relief to avoid double recoveries. *See generally Nathanson*, 344 U.S. at 28–29, 73 S.Ct. at 83–84 (holding that while the NLRB may enforce a back wage award through a bankruptcy court, the judgment is not a debt to the United States, but is instead money owed to the recipient employees on an implied contract, and thus is of equal priority to other wage claims filed against the debtor and further that the NLRB's award should be treated identically to any other wage claims, of which only $600 earned within the three months immediately preceding the petition date is given priority).

Further, as discussed *supra*, those borrowers who are represented by one of the governmental units will not receive something "extra" that borrowers who are not represented will not receive, or at least not in any way that is unfair. As the governmental actions each allege violations of different laws, it is unremarkable that the results of those actions may differ and that borrowers who reside in different states may, on similar facts, end up with different claims against First Alliance. If First Alliance were not in bankruptcy, borrowers in different jurisdictions might receive different recoveries, depending on whether their government took action against First Alliance. Such different recoveries are inherent to a federal system of government, and bankruptcy proceedings were not intended to substitute some different concept of what is equitable.

### b. Harm to the Governmental Units

Making no finding regarding harm to the governmental units, the bankruptcy court failed to consider the harm to the

governmental units of not being allowed to proceed with their actions in their chosen forums.

■■■ First, while the parties dispute the extent to which the bankruptcy court would be able to enter all the equitable relief sought by the governmental units, it is sufficient to note that it would be unusual for a bankruptcy court to reform or rescind thousands of consumer contracts nationwide, set up a claims procedure whereby restitution can be returned to borrowers who have not filed claims in the bankruptcy proceeding, and maintain jurisdiction to enforce injunctions running against officers or directors of a debtor and the debtors' successors and assigns. The bankruptcy court should have considered the hardships that would arise to the governmental units, and through them the public, if all of this relief is justified but not awarded.

Second, the hardship to the governmental units of not being allowed to proceed with their actions in their chosen forums includes harms different in character from the harms normally considered on motions for injunctions under § 105. Being able to have a claim determined by the bankruptcy court is qualitatively different from proceeding with a lawsuit in home forums. As Congress recognized when it created the regulatory and police powers exception, the goals of public policy, punishment, and deterrence may sometimes conflict with the goals of maximizing an individual estate's assets and efficiently processing claims. It is the former goals, which are difficult if not impossible to measure in dollars and cents, that are impaired when a governmental unit loses the ability to enforce its laws in its own forum.

Considering deterrence in particular, the harm to the governmental units must be measured with a broader perspective in mind than these parties alone. The bank-ruptcy court and First Alliance are undoubtedly correct that there will be more money to distribute to borrowers in this case if the separate actions are not allowed to proceed. However, the governmental units are entitled to make the choice that, over time, similarly situated borrowers and consumers benefit more when companies do not violate the law in part because they know that bankruptcy will not provide a way out when their wrongs are discovered. In any given case, reasonable minds could disagree about the marginal costs and the marginal benefits of different approaches and which will maximize the wealth and happiness of the greatest number of people. The point is that it is the governmental units charged with enforcing consumer protection laws, governmental units that are responsive to the political will of the people, that should be the ones to make the choice, not the bankruptcy court.

First Alliance argues that the governmental units did not present evidence of these harms to the bankruptcy court. The governmental units did make these arguments. In its brief opposing the motion for preliminary injunction, the FTC stated, "The [FTC], if enjoined, will be thwarted in its Congressional mandate to enforce the consumer protection statutes." FTC Addendum, Tab 9, at 26:3–4. Florida argued, "On the other side of the ledger, [First Alliance] propose[s] to strip a sovereign State of its central function of administering its own penal and quasi-penal laws in its own Courts. Further, through its focus on Florida's claims for rescission and restitution, [First Alliance] seek[s] to impose the burden of obtaining redress for [First Alliance's] frauds on those least able to bear the burden—the victims of [First Alliance's] business model." FTC Addendum, Tab 12, at 13:17–21. The governmental units may not have presented "evidence" of these harms but, as explained

above, these harms are difficult if not impossible to quantify through evidence. They are harms nonetheless.

### c. Balancing

■■■ While litigation costs may be a factor, the bankruptcy court's finding regarding litigation costs is erroneous because no finding was made of the comparison between litigating in separate forums and the bankruptcy court and because the only evidence presented consisted of conclusory declarations stating that litigation would be much more expensive. The bankruptcy court's findings regarding collateral estoppel, duplicativeness, and inconsistent results are either incorrect or, at the least, these concerns can be mitigated in other ways less extreme than enjoining the governmental units. The harm to the governmental units of not being allowed to proceed separately outweighs the remaining harm to First Alliance.

As to Florida's action against the individual officers and directors of First Alliance, the bankruptcy court concluded that irreparable injury had been shown because of the factors already discussed for the other aspects of the governmental actions. It also found that First Alliance might have to pay for any judgments against the individuals because of the limits of various insurance policies and because of potential indemnification rights. Tr. at 73:10–24. At this point, whether the individuals would be able to seek indemnification from First Alliance is at best an open question. On the other side, however, is the significant harm to the governmental units from not being able to prosecute or bring actions against non-debtor individuals who

have the capacity to engage in the same conduct in the future. Given the hypothetical nature of the harm to First Alliance, the harm to the governmental units weighs more heavily.

Because the bankruptcy court overestimated the amount of irreparable injury present and did not adequately take into account the hardship to the governmental units of not being allowed to continue with their actions outside the bankruptcy court, it failed to balance the harms adequately. Therefore, it abused its discretion in entering the preliminary injunction. Accordingly, its order of preliminary injunction is REVERSED.

### 3. First Alliance's Request for a Permanent § 105 Injunction

■■■ Technically, only the 180–day preliminary injunction is at issue on this appeal. However, oral argument made clear that the inquiry would not be any different on the permanent injunction. The harm to the governmental units would be even greater with a permanent injunction, because realistically they must act now to have any hope of recovering money from First Alliance. If they are stayed and forced to litigate only in the bankruptcy court, they will permanently suffer the intangible harms discussed *supra* and perhaps will permanently lose their abilities to obtain certain forms of relief.[23]

More importantly, First Alliance argued the matter as a permanent injunction. No evidence or argument has been presented as to why First Alliance needs a "breathing spell" for 180 days, but thereafter would be willing to defend the governmen-

---

**23.** This conclusion is particularly compelling given that it appears that the potential liability from lawsuits regarding borrowers, whether brought by borrowers or governmental units, is what makes First Alliance "insolvent." At oral argument, counsel agreed that it is likely that the estate will consist of around $40 or $50 million and the claims of trade creditors, meaning creditors other than the borrowers and the governmental units, total $6 to $20 million.

tal actions separately. At oral argument, counsel for First Alliance stated that litigation costs are currently $500,000 a month, the same amount as they were prepetition. Also at oral argument, it was represented to the Court that First Alliance's current income stream is $1 million per month and that, at the end of the day, it appears that there will be $40 to $50 million in assets to distribute to creditors. Given those figures, and given that the Court has rejected all harms to First Alliance other than, to some extent, diversion of energies and, hypothetically, litigation expenses, the Court concludes that First Alliance could not make the necessary showing to support a permanent injunction. Accordingly, the Court will direct the bankruptcy to enter an order dismissing First Alliance's complaint for a permanent injunction.[24]

## C. Sovereign Immunity

Because the Court has determined that the injunctions requested by First Alliance are not warranted on the merits, either as to the FTC or the States, the Court need not reach the States' argument that their sovereign immunity bars the bankruptcy court from entering an injunction against them.

## IV.

## CONCLUSION

The order of the bankruptcy court enjoining the Consolidated Appellants from proceeding with their separate actions against Appellees is REVERSED. The matter is REMANDED to the bankruptcy court with instructions for the bankruptcy court to vacate its earlier order and enter an order denying both the preliminary in-

junction and the permanent injunction sought by First Alliance.

IT IS SO ORDERED.

---

24. The Court's direction regarding the permanent injunction is further supported by the fact that the governmental units have asked this Court to withdraw the reference as to First Alliance's adversary proceeding seeking a permanent injunction. This Court could have withdrawn the reference and then denied First Alliance's requested permanent injunction.