**In re Raymond PALOMBO, et al., Debtors.**

**Bankruptcy No. 08–bk–21745–MJ. Adversary No. 6:08–AP–01493–MJ.**

United States Bankruptcy Court, C.D. California, Riverside Division.

March 23, 2011.

---

Marcia Bove, Mary Williams, U.S. Department of Labor, Office of the Solicitor,

Washington, DC, for the Secretary of Labor.

### Order Granting Secretary of Labor's Motion For Summary Judgment

MEREDITH A. JURY, Bankruptcy Judge.

Pursuant to Local Bankruptcy Rule 9013–1(3), Hilda L. Solis, Secretary of Labor, United States Department of Labor (the "Secretary"), submitted her Statement of Uncontroverted Facts and Conclusions of Law in support of her Motion for Summary Judgment ("Motion") seeking an order of defalcation in connection with Debtor–Defendant Palombo's conduct as a fiduciary of the Manufacturing and Industrial Workers Benefit Fund ("Fund" or "MIWU Fund"). The Motion sought a ruling on two independent bases. The first basis was that a finding of liability for breach of fiduciary duty based upon a default judgment by the United States District Court for the Northern District of Georgia is binding upon this Court. Second, that independent of the District Court's ruling, Palombo's fiduciary breaches compel a finding of defalcation.[1]

Debtor–Defendant Raymond Palombo ("Palombo") failed to controvert the Secretary's Statement of Uncontroverted Fact and offered only conclusory, unsworn hearsay in response to the Secretary's evidence. Palombo's pleadings referred to documents which were not attached or submitted to the Court. Thus, he failed to put any facts at issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An affidavit offered in opposition to a properly supported summary judgment motion

---

1. The Exhibits and Attachments referenced herein were attached to the Secretary's Motion.

"shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e).

On December 29, 2010, this Court held a hearing on the Secretary's Motion at which both parties appeared. Having considered all of the pleadings and hearing the arguments by the parties, the Court finds that there are no disputed issues of material fact. Based on the foregoing, the Secretary is entitled to summary judgment under Fed.R.Civ.P. 56(c), as a matter of law on both issue preclusion and upon a finding of defalcation as a result of a fiduciary breach in connection with Palombo's duties to the MIWU Fund. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Therefore, Palombo's liability to the MIWU will not be discharged by this bankruptcy.

### PROCEDURAL HISTORY

1. On July 2, 2008, the Secretary filed an action under the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1001 *et. seq.*, against Palombo in the United States District Court for the Northern District of Georgia, Atlanta Division ("the District Court") for violations of his fiduciary duties to the Manufacturing and Industrial Workers Benefit Fund ("MIWU Fund or Fund").

2. It is undisputed that the Secretary personally served Palombo with the summons and amended complaint in *Chao v. Palombo, et al.* Thereafter, the Secretary served Palombo with each filing made in the District Court. Palombo did not respond to the amended complaint or any filing served thereafter.

3. On September 3, 2008, Palombo filed for bankruptcy in this Court.

4. The Secretary's District Court ERISA action, on its face, is excepted from the automatic stay as a police and regulatory action under 11 U.S.C. § 362(b)(4), and at no time did Palombo ask this Court to stay the ERISA action under 11 U.S.C. § 105.

5. On March 10, 2009, the Secretary filed a Motion for Default Judgment against all defendants in the ERISA action. *See* Declaration of Marcia Bove ("Bove Decl."), Attachments D and E. Palombo did not respond to the Motion.

6. On June 9, 2009, the District Court entered a default judgment against each defendant except Palombo. *Id.*, Attachment F. As to Palombo, it directed the Secretary to obtain an order from this Court determining the application of 11 U.S.C. § 362(b)(4) to the Secretary's claim against Palombo. *Id.* Palombo was aware of the default judgments against his co-defendants.

7. On June 17, 2009, the Secretary filed a motion styled as a lift stay motion with this Court, as directed by the District Court. Palombo did not respond.

8. On July 21, 2009, this Court entered an Order stating that the automatic stay did not "prohibit or affect the Secretary's prosecution of her District Court action" because the ERISA case is excepted from the automatic stay as a police and regulatory action under 11 U.S.C. § 362(b)(4). This Court served its Order on Palombo.

9. On August 27, 2009, the Secretary submitted the July 21, 2009 Order to the District Court and again moved for default judgment against Palombo. *See* Bove Decl., Attachment G. Palombo was served with this pleading. Palombo did not respond.

10. On October 8, 2009, the District Court entered a default judgment against Palombo. To support its liability ruling,

the District Court incorporated by reference the factual findings contained in its June 9, 2009 ruling. Thus, the factual predicate for the June 9, 2009 and October 8, 2009 liability rulings was the same.

11. The District Court ruled that Palombo violated sections 404(a)(1)(D), 29 U.S.C. 1104(a)(1)(D) (breach of duty to comply with the plan terms); 404(a)(1)(A), 29 U.S.C. 1104(a)(1)(A) (breach of duty of loyalty); 404(a)(1)(B), 29 U.S.C. 1104(a)(1)(B) (breach of duty of prudence); and 406(b)(2), 29 U.S.C. 1106(b)(2) (breach of duty against self-dealing). *Id.*, Attachment H (October 8, 2009 Order at page 4) and Attachment F (June 9, 2009 Order at pages 16–20).[2] Palombo did not seek review of the October 8, 2009 Order.

12. On October 26, 2009, the District Court ruled by default judgment that Palombo and his codefendants were jointly and severally liable to the MIWU Fund for $2,958,681.36 in losses caused by their fiduciary breaches. *See* Bove Decl., Attachment I. Palombo did not seek review of that Order.

13. After finding that Palombo and his codefendants were fiduciaries with respect to the MIWU Fund, breached their fiduciary duties and thereby caused losses of $2,958,681.36 to the Fund in unpaid benefit claims liability, the District Court ruled that, under ERISA § 409(a), Palombo and his codefendants were personally liable for "any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). *Id.* (October 26, 2009 Order at pages 3–6). Accordingly, it entered an order granting monetary relief jointly and severally against them in the amount of $2,958,681.36. *Id.*

14. On May 11, 2007, the District Court appointed an Independent Fiduciary ("IF") to identify all valid, unpaid claims due and owing to Fund participants, beneficiaries, and/or their assignee healthcare providers, process and determine the Fund's unpaid claims. *See* Consent Order in *Chao v. Manufacturing & Industrial Workers Benefit Fund,* Case No. 07–cv–654–JC (N.D.Ga.2007). *See* Attachment B to Bove Decl.

15. The District Court's loss calculations were determined by the IF after notice to all Fund participants, beneficiaries, and their assignee health care providers. The IF decided all claims and determined that: 1) aggregate liability for the CMA members' transferred existing claims was $1,987,025.57 and 2) aggregate liability for their claims incurred after the Fund's effective date was $971,655.79. Thus, the Fund's total unfunded claims liability was $2,958,681.36.

16. Palombo did not seek to have either the October 8, 2009 or October 26, 2009 Orders vacated, and they became final orders.

17. Palombo has been represented in this matter, successively, by Dale Parham and Mark C. Schnitzer. Counsel Schnitzer and counsel for the Secretary discussed potential resolution of the Secretary's adversary complaint in connection with the Joint Status Conferences held in this case. *See, e.g.,* March 12, 2009 Joint Status Report. Since Counsel Schnitzer withdrew, Palombo has represented himself on a *pro se* basis before this Court.

**FACTUAL FINDINGS**

18. On December 1, 2004, Mitchel Coneley, signed an "Agreement and Decla-

---

2. The District Court also ruled that Palombo violated section 406(b)(2) of ERISA by diverting plan assets for his own benefit and the benefit of other persons and entities who were adverse to the MIWU Fund through, inter alia, the payment of commissions, CMA membership fees, and union dues. *Id.*

ration of Trust Creating the Manufacturing and Industrial Workers Benefit Fund," effective November 1, 2004. *See* Ex. 3 ("Trust Agreement") to Declaration of Linda Hamilton ("Hamilton Decl.").

19. Mitchel Coneley was the MIWU Fund's trustee in name only. He failed to create any policies or procedures to ensure the Fund's prudent administration, control of its assets, or even its initial solvency. *See* Hamilton Decl. at pp. 2–4.

20. Palombo acted as a key liaison between Mitchel Coneley, the MIWU Fund, and its service providers, and he took and maintained control of the Fund's plan assets from the Fund's inception. *Id.* at pp. 2–11.

21. Acting through CMA, Palombo appointed Gary Couch to serve as a "management trustee" of MIWU. *Id.* Ex. 4 to Hamilton Decl.

22. Couch took no action on the MIWU Fund's behalf, apart from signing the Agreement and Declaration of Trust Creating the Fund. *Id.* at p. 3, ¶ E.

23. The collective bargaining agreement ("CBA") between the MIWU Fund and participating employers specified that the Fund was to be funded by employer and employee contributions. *Id.* Exs. 19 and 20 (Collective Bargaining Agreements, § 4); Ex. 3 (MIWU Trust Agreement, Article IV, § 1(a)).

24. The MIWU Trust Agreement authorized the trustees to provide benefits to the employees (Article V, § 2(b)), *see* Ex. 3 Hamilton Decl. Employers made contributions to the Fund that Palombo collected. *See* Ex. 6 to Hamilton Decl. (Spreadsheet showing, *inter alia*, contributions Palombo collected from January 1, 2005 through March 31, 2005).

25. The express purpose of the MIWU Trust Agreement was to provide medical and welfare benefits to the employees of sponsoring employers and their beneficiaries. *See* Hamilton Decl., Ex. 3 at Article II, § 1.

26. Palombo owned and operated a corporation, Contractors & Merchants Association ("CMA"). He held CMA out to the public as an employer association that could provide its employer members with discount health care benefits. *See, e.g.,* Ex. 19, Hamilton Decl. (Unichoice Summary Plan Description provided by CMA to participating employer, Odyssey).

27. Palombo signed a separate Transfer Agreement transferring his CMA members and their existing claims liability to the newly created MIWU Fund ("the Transfer Agreement"). *See* Exs. 1 and 2, Hamilton Decl.

28. Effective January 1, 2005, Palombo transferred 880 CMA members from an insolvent ERISA fund sponsored by the International Union of Public and Industrial Workers Union ("IUPIW") to the MIWU Fund. *See* Ex. 6, Hamilton Decl. (Spreadsheet, *inter alia*, identifying transferred participants).

29. The Transfer Agreement provided that the IUPIW Fund's existing claims liability for Palombo's CMA members was transferred to the MIWU Fund without recourse and without specifying the dollar amount of that liability or the dollar amount of the consideration that the MIWU Fund was to receive for accepting it. *Id.*

30. Coneley never established any underwriting or administrative procedures for the Fund, and he did not ensure that contributions were collected or held in trust for the Fund's participants and beneficiaries. *See* Hamilton Decl. at pp. 2–4. Nor did Coneley establish a MIWU Fund checking account. These omissions allowed Palombo to control the Fund and its assets.

31. Contrary to the requirements of the governing Plan documents and ERISA, neither Coneley nor Palombo established a reserve or funding policy that would permit determination of the MIWU Fund's liquidity and financial needs in light of the benefits promised. *Id.* at p. 4, ¶ I and J.

32. Palombo exercised discretionary control over the management and disposition of the Fund's plan assets. He determined what and who would be paid and diverted substantial plan assets to pay himself commissions and pay dues to the unions that had acted successively as nominal plan sponsors for his CMA association members. *Id.* at p. 6, ¶ T and Exs. 11–12; p. 8, ¶ X and Exs. 13–15.

33. Palombo determined participants' eligibility and set their contribution rates by carrying forward their existing contribution rates. *Id.* Exs. 2 and 18 to Hamilton Decl. and at p. 9, ¶ AA.

34. Palombo controlled participant communications. *Id.* at p. 4, ¶ L.

35. Palombo also determined his own commissions and CMA fees. He also paid union dues when he knew or had reason to know that the union had not engaged in collective bargaining of behalf of any MIWU Fund participant. *Id.* Ex. 6 to Hamilton Decl.

36. Palombo exercised discretionary control and authority over management and disposition over the Fund's plan assets from its inception. From January 1, 2005 through March 31, 2005, Palombo collected all employer and employee contributions totaling at least $1,357,177. Hamilton Decl. at pgs. 4–5, ¶ O. He then deposited these contributions directly into a CMA checking account that Palombo controlled and denominated, "CMA Trust Account," which was the only account into which contributions were initially deposited. *Id.*

37. As a signatory on the CMA Trust Account, Palombo negotiated financial transactions at will. He made withdrawals in the form of checks and wire transfers to pay the administrative fees of the Fund's service providers. *Id.* Hamilton Decl. at p. 5 ¶ M.[3]

38. Palombo paid a second service provider, Contract Benefit Administrative Services, Inc. ("CBAS, Inc."), which had been retained to provide comprehensive administrative services to the Fund, a total of $141,562 in two payments: the first payment of $46,960 was on January 13, 2005 by wire transfer signed by Raymond Palombo from the CMA Trust Account, and the second payment of $94,602 was a February 1, 2005 wire transfer signed by Raymond Palombo from the same CMA Trust Account. Hamilton Decl. at p. 6, ¶ T, Exs. 11 and 12.

39. CBAS, Inc. terminated its Service Agreement with the Fund on February 14, 2005 due to its concerns about the Fund's improper administration. CBAS, Inc. acknowledged that it had processed no claims for the Fund, but refused to return $37,500 because of the expenses it incurred

---

**3.** For example, on January 25, 2005, Palombo sent the Fund's contract administrator, Claims And Benefit Management, Inc. ("CBM"), a wire transfer in the amount of $48,020 from the CMA Trust Account which was payable to the CBM Claim Account # 2 MIWU. Hamilton Decl. at p. 8, ¶ and Ex. 13. On February 2, 2005, Palombo sent CBM a wire transfer in the amount of $21,469 from the CMA Trust Account which was payable to the CBM Claim Account # 2 MIWU. *Id.* Ex. 14. On March 3, 2005 Palombo sent CBM a wire transfer in the amount of $162,588 from the CMA Trust Account which was payable to the MIWU Health Plan Trust Account for CBM to pay claims. *Id.* Ex. 15. On April 8, 2005, Palombo sent CBM a wire transfer in the amount of $192,752 from the CMA Trust Account which was payable to the MIWU Health Plan Trust Account. *Id.* Ex. 16.

to set up the Fund's administration. Hamilton Decl. at p. 6–7, ¶ U–W, Ex 10 (February 14, 2005 letter from counsel for CBAS).

40. Palombo took no action to have CBAS, Inc. refund the advanced payments. Hamilton Decl. at p. 4–5, ¶ O.

41. Palombo also diverted substantial plan assets to pay his own commissions and CMA association fees and to pay union dues even though neither Palombo nor these entities provided any legitimate, reasonable, or necessary services.[4]

42. Palombo moved his CMA members from an ERISA-covered fund nominally sponsored by the IUIIW, to one nominally sponsored by the IUPIW, and then to this Fund, nominally sponsored by the MIWU. *See* June 9, 2009 District Court Order at pp. 2–3 (Attachment F). As shown by the CBA Palombo provided to one participating employer, Odyssey Partners, Palombo did not change the name of the union on the CBA when moving his CMA members from one to the next union.[5]

43. The Texas Department of Insurance ("TDI") issued a Cease and Desist Order on March 3, 2005, effectively closing the MIWU Fund. Hamilton Decl. at p. 9 ¶ Z, Ex. 18. ("Order"). TDI named, among others, Palombo, CMA, the IUIIW and its fund, the IUPIW and its fund, the MIWU and this Fund as respondents and found that they had violated Texas state law by engaging in the "unauthorized business of insurance and/or had been committing unfair or deceptive acts or practices by selling, issuing, or administering fraudulent, false, or misleading health insurance." *Id.* at p. 4. TDI found that Respondents' conduct was "fraudulent" and "create[d]" an "immediate danger to public safety" and had "resulted in unpaid claims, which are not expected to be funded" and that the "plans are in a hazardous financial condition, and Respondents' continued conduct is an immediate danger to public safety." *Id.* at p. 7. TDI also described an incident in which Palombo, through CMA, attempted to enroll the employees of a staff leasing company into the MIWU Fund without engaging in collective bargaining negotiations or holding a vote to approve a CBA or join the MIWU. *Id.* Palombo instead distributed a "standardized CBA" form and represented that "it was a requirement to join the [MIWU], but it was not like a labor union, it was only to receive health benefits at a lower rate." *Id.* TDI also found that many former IUIIW Fund and IUPIW Fund participants were participating in the MIWU Fund and that three current MIWU union and/or fund officials had been associated with the IUIIW. *Id.*

44. When the Fund stopped operating, it had no assets, thousands of unprocessed claims, and no meaningful administrative

---

4. From the contributions Palombo collected and held in the CMA Trust, he deducted CMA membership fees of $43,980 and commissions of $163,694. *Id.* Ex 6 (Spreadsheet showing, *inter alia*, deductions Palombo took from the contributions he collected from January 1, 2005 through March 31, 2005 and held in the CMA Trust). Palombo also deducted union dues of $87,840 and paid those dues knowing no collective bargaining had been undertaken on behalf of the Fund participants. *Id.* During the three months that the Fund operated, Palombo diverted a total of $295,514 in plan assets to himself and other parties whose interests were adverse to the Fund's interests. *Id.*

5. Palombo transferred employer Odyssey Partners from the IUPIW Fund to the MIWU Fund, and that employer gave the Secretary the CBA under which it participated in the Fund. It was an unsigned prototype that referred only to the International Union of Industrial and Independent Workers ("IUIIW"), a purported union in which Palombo's CMA members had previously participated. *See* Ex. 19 to Hamilton Decl. at 72(a).

records. Rather, it had only the raw claims and provider invoices stuffed in cardboard boxes at CBM's Chino, California office. *Id.* at p. 10, ¶ CC.

## CONCLUSIONS OF LAW

1. This action is an Adversary Proceeding under 11 U.S.C. § 523(a)(4) to establish the non-dischargeability of a debt.

2. This Court has jurisdiction over this proceeding under 28 U.S.C. § 157(b)(1) in that this Adversary Proceeding is a "core proceeding" as defined by 28 U.S.C. § 157(b)(2)(I).

3. ERISA was designed to "protect the interests of participants in employee benefit plans and their beneficiaries" and to "establish standards of conduct, responsibility, and obligations for fiduciaries of employee benefit plans ... by providing for appropriate remedies, sanctions, and ready access to Federal courts." 29 U.S.C. § 1001(b). To carry out these purposes, the Act regulates virtually all aspects of qualified employee benefit plans, including reporting and disclosure, 29 U.S.C. §§ 1021–1031; participation and vesting, 29 U.S.C. §§ 1051–1061; funding, 29 U.S.C. §§ 1081–1086; fiduciary responsibility, 29 U.S.C. §§ 1101–1114; and administration and enforcement, 29 U.S.C. §§ 1131–1145. Specifically, with respect to fiduciaries, the Act not only details the duties imposed upon them, 29 U.S.C. § 1104, it also imposes personal liability for losses caused by breaches of those duties. 29 U.S.C. § 1109(a).

## ISSUE PRECLUSION

4. Independent of this Court's ruling on the merits of this case, the Secretary is entitled to summary judgment on the grounds of issue preclusion. It is undisputed that the Secretary personally served Palombo with her ERISA action and every subsequent filing in that case. The Secretary's ERISA action is, on its face, excepted from the automatic stay as a police and regulatory action under 11 U.S.C. § 362(b)(4). Congress expressly recognized certain categorical exceptions to the automatic stay of 11 U.S.C. § 362(a). *See* 11 U.S.C. § 362(b) (listing exceptions). Further, at no time did Palombo ask this Court to stay the ERISA action under 11 U.S.C. § 105 as a debtor (or trustee) is required to do in the case of an excepted police and regulatory action. *In re Tauscher,* 7 B.R. 918, 920 (Bankr. E.D.Wis.1981) ("[t]he effect of an exception is ... to shift the burden of requesting relief to the debtor or trustee, and away from the excepted parties listed in § 362(b)"); *In re Charter First Mortgage, Inc.,* 42 B.R. 380, 385 (Bankr.D.Or.1984) (same).

5. On June 9, 2009, the District Court entered a default judgment in the ERISA action (Attachment F) which contained detailed findings addressing the conduct of Palombo and his co-fiduciaries and it granted a default judgment against all defendants except Palombo. As to him, it directed the Secretary to obtain from this Court a ruling addressing applicability of the automatic stay to the ERISA claim against Palombo. By its Order of July 21, 2009, this Court stated that the automatic stay did not "prohibit or affect the Secretary's prosecution of her District Court action" because it was excepted from the automatic stay under 11 U.S.C. § 362(b)(4). The Court served Palombo with its July 21, 2010 Order, and both cases continued to proceed simultaneously.

### a. Legal Standard for Issue Preclusion

6. Issue preclusion (or "collateral estoppel") prevents a party from relitigating facts and legal conclusions underlying liability adjudged against him in a prior action involving the same parties and claims if he had notice of and a full and

fair opportunity to litigate the issue in the prior action. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 332–33, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). In addition to relieving "parties of the cost and vexation of multiple lawsuits," preclusion "conserve[s] judicial resources," and by "preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). The elements of issue preclusion are: (1) a full and fair opportunity to litigate the issue in the prior action; (2) the issue was actually litigated in the prior action; (3) the issues were determined by a final, valid judgment; and (4) the person against whom issue preclusion is asserted in the present action was a party or in privity with a party in the prior case. *Pena v. Gardner,* 976 F.2d 469, 472 (9th Cir.1992); *see also Grogan,* 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (citing Restatement (Second) Judgments § 27(1982)).

**b. The Elements of Issue Preclusion Are Met**

7. Palombo, a defendant in both actions, had a full and fair opportunity to litigate. His fiduciary status and his ERISA violations by failing to properly account for the claims against the Fund were established by the District Court. The only element of issue preclusion in question here is the "actually litigated" element. In this case, that element is satisfied. The Ninth Circuit has recognized exceptions to the general rule that federal default judgments generally do not have preclusive effect under federal common law. One of the exceptions is when the losing party had notice of and a full and fair opportunity to participate in the prior case, but ignored that opportunity and abandoned or obstructed the adjudicative process. *See, e.g., In re Daily,* 47 F.3d 365, 368 (9th Cir.1995). Palombo was personally served with the summons, amended complaint, and each subsequent document filed in the ERISA case. Thus, he had ample notice of the ERISA action.

8. Palombo had every incentive to fully litigate the ERISA case. He was the principal defendant in the Secretary's ERISA case. He was served with the District Court's June 9, 2009 order which contained factual findings that explicitly addressed his conduct and the ERISA violations arising from that conduct. Thus, the importance of the facts to this litigation was clearly foreseeable at the time of the earlier action which was ongoing, not years earlier. Moreover, even after the District Court took the extraordinary step of staying the ERISA action and directing the Secretary to obtain an order from this Court addressing the stay, and this Court stated that the ERISA case was not subject to the stay, Palombo continued to default in the ERISA action. Given the factual findings contained in the District Court's June 9, 2009 ruling and this Court's July 21, 2009 Order, application of issue preclusion was plainly foreseeable. Palombo did not seek to vacate or set aside either the October 8, 2009 liability judgment or the October 26, 2009 monetary judgment. Thus, the District Court's rulings became a valid, final judgment.

9. Palombo had notice of and numerous opportunities to defend the ERISA case; he chose not to do so. The District Court's detailed findings and legal conclusions were exhaustive and carefully considered. The factual and legal issues addressed by the District Court in ruling that Palombo was a fiduciary and breached his fiduciary duties are essentially identical to the factual and legal issues presented here.

10. Given the posture of this case, the "actually litigated" element is satisfied.

This element is satisfied when the defaulting party obstructed adjudication of the prior case. The Ninth Circuit stated in *Daily*,

[a] party who deliberately precludes resolution of factual issues through normal adjudicative procedures may be bound, in subsequent, related proceedings involving the same parties and issues, by a prior judicial determination reached without completion of the usual process of adjudication.

47 F.3d at 369. Like *Daily*, the "actually litigated" element is met by Palombo's failure to participate in the prior ERISA action when he had "a reasonable opportunity to defend himself on the merits," but chose not to do so. *Id.*

■ 11. The elements of federal common law claim preclusion are designed to ensure notice of and a full and fair opportunity to be heard in the prior case. Fairness hinges on whether the party, at the time of the earlier action, could foresee that the issues now subject to estoppel could be significant in the future litigation. After the June 9, 2009 District Court ruling which forecast that Court's likely ruling as to Palombo and this Court's July 21, 2009 Order, which occurred almost contemporaneously, it was clearly foreseeable that the consequences of not defending the ERISA case would be issue preclusion in this bankruptcy proceeding. Thus, due process would not be violated by applying issue preclusion to hold Palombo to the consequences of his choices. The policy that animates federal common law is due process. That policy is met on these facts, and failure to apply claim preclusion would elevate form over substance given the facts in this record.

■ 12. "[I]t is implicit in the doctrine of collateral estoppel that, where a party has been accorded a full and fair opportunity to litigate an issue in a prior proceeding, due process is not violated by denying the party a further opportunity to litigate the same issue in a subsequent proceeding." *In re Daily*, 47 F.3d at 369. A "second bite at the apple" is not deserved when a party knowingly chooses not to defend himself in the first instance. *In re Bush*, 62 F.3d 1319, 1324 (11th Cir. 1995). *See also In re Stanley–Snow*, 405 B.R. 11, 20–21 (1st Cir. BAP 2009) (same). "[I]f a debtor is unsatisfied with a judgment which might bind him in later proceedings, his remedy is an appeal, not relitigation of the matter in another court." *In re Wien*, 155 B.R. at 486. "[D]efault judgments provide the sanction that compels defendants to play the game and abide by the rules. Claim and defense preclusion are necessary to make the sanction effective." *Id.* (quoting, 18 Charles Wright, Arthur Miller, Edward H. Cooper, Federal Practice and Procedure § 4442 (1981). 13. Moreover, the facts here support the conclusion that Palombo's default was a choice. Palombo made the effort to represent himself in this Court on a *pro se* basis. He has not explained why he could not have done the same in the ERISA action. "[E]ven if [a]n issue was not litigated, the party's reasons for not litigating in a prior action may be such that preclusion would be appropriate"). Restatement (Second) of Judgments § 27 cmt. e (1982). Whatever Palombo's reasons, he deliberately chose not to participate in the ERISA case, but now seeks to litigate the same issues in this Court. That is forum shopping. Failure to apply issue preclusion would reward Palombo's disregard of the District Court's process. Likewise, it would undermine this Court's July 21, 2009 Order and the Congressional policy implemented by that Order. In expressly recognizing certain categorical exceptions to the automatic stay, Congress balanced the goals of the automatic stay with other

important public interests. *In re First Alliance Mortgage Co.*, 264 B.R. 634, 645 (D.C.Cal.2001). These categorical exceptions are necessary "to prevent the bankruptcy court from becoming a haven for wrongdoers." *Id. See Grogan*, 498 U.S. at 286–87, 111 S.Ct. 654. Moreover, to do so would be contrary to the public interest.

### c. Application of Issue Preclusion Protects the Public Interest.

15. A second trial will necessarily require the Secretary to incur further expenses and waste both the Secretary's and the Court's limited resources. The Secretary's responsibilities to the public outweigh any potential cost Palombo might have incurred in defending the ERISA action in the District Court. First, it is far from clear that Palombo would have incurred any additional costs if he had represented himself in the ERISA action just as he has done in this Court. Second, even if he incurred such costs, they alone cannot excuse a debtor from defending a police and regulatory action excepted from the stay 11 U.S.C. § 362(b)(4). Here, Palombo had a full and fair opportunity to defend the ERISA case. Fund participants, beneficiaries, and their assignee healthcare providers were left without benefits or reimbursement as a result of Palombo's conduct. Balancing the equities, the public interest, and judicial economy, clearly requires that the default judgment be given preclusive effect in this nondischargeability proceeding. The factual and legal issues are the same in both cases. As discussed above, the District Court's findings support a defalcation finding, and Palombo is barred by the principles of issue preclusion from relitigating facts and issues already adjudicated.

### ERISA § 404(a) VIOLATIONS

16. The Fund holds the assets of several "employee welfare benefit plans" within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1), each of which was established by the individual employers who paid contributions for the benefits offered by the Fund, and the assets of the Fund are assets of plans subject to coverage under ERISA pursuant to section 4(a) of ERISA, 29 U.S.C. § 1003(a).

### a. Palombo's Fiduciary Status

17. Under ERISA, fiduciary status is construed "liberally, consistent with ERISA's policies and objectives." *Ariz. State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 720 (9th Cir.1997). ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). Thus, ERISA fiduciaries include not only those specifically named in a plan document, 29 U.S.C. § 1102(a), but also any individual who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," 29 U.S.C. § 1002(21)(A)(i).

18. Exertion of control over plan assets vests the party having such control with fiduciary status. ERISA's definition of "fiduciary" in § 3(21)(A) states: "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. . . ." 29 U.S.C. § 1002(21)(A)(i). Consistent with the plain language of ERISA § 3(21)(A), case law makes clear that any control over plan assets, as for example check writing or other authority on bank accounts holding such assets, makes the party a fiduciary

regardless of whether any "discretion" is involved. *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir.1997); *Coldesina v. Simper*, 407 F.3d 1126, 1132–34 (10th Cir.2005). Palombo collected all contributions to the Fund and deposited them into an account he controlled. From that account, he made withdrawals in the form of checks and wire transfers at will. Thus, Palombo was a fiduciary with respect to the Fund because he controlled the management and disposition of its assets.

19. Palombo also exercised a broad range of discretionary authority and control over the Fund's management by, among other things, causing the Fund to accept the IUPIW Fund's existing liability for his CMA members and setting the contribution rates of his CMA members after they were transferred to the MIWU Fund.

20. At all relevant times, Palombo, individually and through CMA, exercised discretionary authority or discretionary control respecting management of the MIWU Fund, exercised authority or control respecting management or disposition of its assets, or had authority or discretionary responsibility in the administration of the MIWU Fund and therefore was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

21. At all relevant times, Palombo and CMA also were each a party in interest within the meaning of ERISA § 3(14)(B) and (D).

**b. Palombo's ERISA § 404(a) Violations**

22. Under ERISA, fiduciaries have a duty to act in the best interests of plan participants by ascertaining and maintaining cost-effective strategies; using the care and prudence of a reasonable expert in like circumstances; working to minimize the risk of large losses in the process of diversifying investments; and by complying with plan documents to the extent they are consistent with ERISA. *See* 29 U.S.C. § 1104(a)(1)(A)-(D). A fiduciary who violates these strict fiduciary duties may be held personally liable under ERISA § 409(a), 29 U.S.C. § 1109(a), for any resulting plan losses and any profits he made through the use of plan assets.[6]

23. Palombo breached his fiduciary duties of loyalty and prudence to the Fund when he caused it to accept from the IUPIW Fund the existing claims liability of his CMA members without determining the dollar amount of that liability and ensuring that the Fund would have sufficient assets to pay it. *Local Union 2134, United Mine Workers of Am. v. Powhatan Fuel, Inc.*, 828 F.2d 710, 713 (11th Cir.1987) (finding fiduciary had duty to attempt to maintain sufficient funds for proper plan administration); *Liss v. Smith*, 991 F.Supp. 278, 299 (S.D.N.Y.1998) (failure to monitor fund's solvency and adjust benefit levels is a fiduciary breach); *Dippel v. Joint Bd. of Trustees of the Operating Engineers Trust Fund*, 1982 WL 2085 (D.D.C. May 6, 1982) at *7 (there is a fiduciary duty "to alter existing types and levels of medical benefits available under the Plan when the financial solvency of the Fund so re-

---

**6.** 29 U.S.C. § 1109(a) states:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each

such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

quires") (dicta); *Gruby v. Brady*, 838 F.Supp. 820, 825–829 (S.D.N.Y.1993) (same).[7] Palombo again breached his duties of loyalty and prudence when he failed to set contribution rates for prospective claims consistent with prudent actuarial standards. Palombo's violations of ERISA § 404(a)(1)(A) and (B) resulted in unfunded claims liability of $2,958,681.36 for the MIWU Fund.

24. These violations were particularly egregious given Palombo's knowledge that his CMA members' claims previously had caused the IUPIW Fund's insolvency.

▮ 25. Palombo also failed to administer the Fund in accordance with the terms of the governing Plan documents and ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) by failing to establish a reserve as required by the Trust Agreement.

### c. Relief for ERISA § 404(a) Violations

▮ 26. The Fund's losses include all valid, unpaid benefits claims against the Fund. *See Connelly Mgmt. Employee, Welfare Benefit Plan v. North Am. Indem., N.V.*, 2008 WL 1336085 *8, *11–12 (S.D.Ind. April 8, 2008) (ruling that under 409(a), fiduciaries who undercapitalized a sham reinsurer relative to its claims liability and who, for their own benefit, "perpetrated a pre-planned default in the payment of valid insurance claims" were liable to repay both "the loss to the plans, *i.e.*, the adjudicated-valid, but unpaid benefit claims" plus disgorgement of any profits the breaching fiduciaries realized by their

use of plan assets and prejudgment interest); *Pfahler v. National Latex Products Co.*, 2009 WL 961166 *5 (N.D.Ohio April 7, 2009) (ruling that plan could recover benefits due for all medical claims submitted, but unpaid) (*citing Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985) (citing Restatement (Second) of Trusts § 205(c) (under trust law, a breach is remedied by restoring the beneficiary to the position which he would have held but for the breach of trust))). *Accord, LaRue v. De-Wolff, Boberg & Associates, Inc.*, 552 U.S. 248, 253, n. 4, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008) (citing 1 Restatement (Second) of Trusts § 205 and *Varity Corp. v. Howe*, 516 U.S. 489, 508–12, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)). As determined by the court-appointed IF, the unpaid, adjudicated claims liability of the Fund is $2,958,681.36.

### PALOMBO'S DEFALCATION UNDER § 523(a)(4) (Misaccounting).

▮ 27. Section 523(a)(4) of the Bankruptcy Code bars discharge of debts arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The elements of a non-dischargeability claim are: 1) an express or statutory trust; 2) the debtor acted as a fiduciary respecting the trust when the debt arose; and 3) in the course of performing his fiduciary duties respecting the trust, the fiduciary committed an act of fraud or defalcation. *In re Niles*, 106 F.3d 1456, 1461–62 (9th Cir.1997).

---

**7.** *See also GIW Industries, Inc., v. Trevor, Stewart, Burton & Jacobsen, Inc.*, 895 F.2d 729 (11th Cir.1990) (fiduciaries violated ERISA § 404(a)(1)(B) by failing to investigate the plan's cash flow requirements); *Pension Benefit Guar. Corp. v. Fletcher*, 750 F.Supp. 233, 236 (W.D.Tex.1990) ("Section 404 im-

poses a stringent obligation. Allowing the assets of the plan to fall below its commitments ... violates that obligation.") *see also Central States Pension Fund v. Central Transport*, 472 U.S. 559, 571–72, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985).

28. The Niles elements are met here. The Fund, which Palombo designed and controlled, was a trust within the meaning of § 523(a)(4) because it held the assets of several employee welfare benefit plans within the meaning of ERISA. As discussed above, Palombo was a fiduciary respecting the Fund, and ERISA fiduciary duties are statutory duties within the meaning of § 523(a)(4). *In re Hemmeter,* 242 F.3d 1186, 1190 (9th Cir.2001). Finally, Palombo's debt arose from a defalcation while acting in his fiduciary capacity as to the Fund. Thus, his debt is non-dischargeable under 11 U.S.C. § 523(a)(4).

### a. Defalcation

29. The Bankruptcy Code does not define defalcation; however, the Ninth Circuit has recognized that the failure to meet a fiduciary duty to a trust is a defalcation. *See, e.g., In re Briles,* 228 B.R. 462, 467 (Bankr.S.D.Cal.1998), *aff'd,* 16 Fed.Appx. 698 (9th Cir.2001) (debtor committed a non-dischargeable defalcation when she failed to timely record a deed entrusted to her, thereby allowing IRS to record a lien and obtain a priority that reduced the deed's value).

30. Liability which is imposed on a trust as a result of "defalcation" by a fiduciary is injury to the trust res. *See In re Kelley,* 2008 WL 8013409 (Bankr. S.D.Cal. July 15, 2008); *In re Briles,* 228 B.R. at 467.[8] In the ERISA context, the "trust res" is the Fund, not just the plan assets. *See In re Hemmeter,* 242 F.3d at 1190 ("[t]he trust res is identified by the creation of the plan itself") (citing 29 U.S.C. § 1102).

31. Palombo, as an ERISA fiduciary, asserted control over the Fund itself, not just its assets. Improperly imposing debt on the Fund (trust res) as a result of fiduciary control can be a defalcation. *Kelley,* 2008 WL 8013409, at *7; *Briles,* 228 B.R. at 467; *In re Goodwin,* 355 B.R. 337, 345 (Bankr.M.D.Fla.2006) ("Creating a debt by breaching a fiduciary duty is sufficient to constitute defalcation, even in the absence of bad faith"). Here, Palombo's fiduciary breaches caused the Fund to be liable for valid, unpaid claims and, therefore, constituted a defalcation.

### b. Debt

32. Palombo's debt to the Fund for its unfunded claims liability "aris[es] from" his defalcation. *See Cohen v. de la Cruz,* 523 U.S. 213, 220, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). *Cohen* held that "debt" under § 523(a)(2)(A) includes all losses caused to those defrauded regardless of whether the total loss "exceeds the value obtained by the debtor." *Id.* at 222–23, 118 S.Ct. 1212.[9] As in *Cohen,* acts of defalcation, like acts of fraud, may incur more debt or liability than the actual money received. *Cohen,* 523 U.S. at 222–23, 118 S.Ct. 1212. Even though Palombo knew the Fund could not pay the accumulating claims liability, he continued to him to pay himself and other entities from the contributions. He did not, however, analyze how much was needed to pay the participants' claims. When the time came

---

8. *See generally, In re Evans,* 161 B.R. 474, 477 (9th Cir. BAP 1993) ("fiduciary relationship with respect to property subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person....")

9. As a general principle applicable to all 523(a) exceptions, the Court said, "[t]he various exceptions to discharge in § 523(a) reflect a conclusion on the part of Congress "that the creditors" interest in recovering full payment of debts in these categories outweigh[s] the debtors' interest in a complete fresh start." *Cohen,* 523 U.S. at 220, 118 S.Ct. 1212.

for participants to make their claims, there was no money. Palombo's accumulation of debt on the trust res for his own personal benefit is a defalcation and falls under the "full liability" *Cohen* recognized as "nondischargeable." *Id. See also In re Kleinfeld,* 1994 WL 650057, at *2 (9th Cir. Nov. 16, 1994); *In re Roussos,* 251 B.R. 86, 94 (9th Cir. BAP 2000).

**c. Intent**

 33. The wrong committed by a fiduciary does not have to be intentional. A misaccounting is sufficient. The undisputed facts show Palombo knew the Fund was insolvent at inception and could not pay the benefits he promised to participating employers and Fund participants. Palombo permitted the Fund to fall deeper into debt because the contributions were inadequate to pay the associated liabilities. Palombo's failure to make actuarially sufficient projections determining claims liability, both existing and prospective, resulted in insufficient funds to pay claims and was a defalcation. Thus, Palombo's debt to the Fund for all valid, unpaid claims (which totaled $2,958,681.36) arose from his fiduciary defalcation. *Cohen,* 523 U.S. at 220, 118 S.Ct. 1212.

34. While there is ample evidence concerning Palombo's knowing conduct, this Court need not examine his intent to find a defalcation. Even if Palombo did not know he imposed insurmountable debt on the Fund when he caused it to accept the IUPIW Fund's existing claims liability for his CMA members and failed to set prudent contribution rates sufficient to pay their new claims, such conduct is a fiduciary defalcation under § 523(a)(4). *In re Lewis,* 97 F.3d 1182, 1186 (9th Cir.1996) (a

fiduciary defalcation "includes the innocent default of a fiduciary").[10]

**CONCLUSION**

35. The Fund's participants contributed assets to the Fund through their contributions. Palombo's defalcation resulted when he promised benefits to Fund participants and their employers even while he increasingly burdened it with debt and despite his knowledge that the Fund had insufficient assets to pay its increasing liabilities. The failure to pay promised benefits is itself the ultimate defalcation. *Cf. Central Laborers' Pension Fund v. Heinz,* 541 U.S. 739, 743, 124 S.Ct. 2230, 159 L.Ed.2d 46 (2004) (ERISA's primary goal is "protecting employees' justified expectations of receiving the benefits their employers promise."). As a result of this defalcation, Palombo is liable for $2,958,681.36. That judgment will not be discharged by this Court.

IT IS SO ORDERED.

10. *See also In re Baird,* 114 B.R. 198, 204 (9th Cir. BAP 1990) (same); *In re Short,* 818 F.2d 693, 694 (9th Cir.1987); *Chao v. Duncan (In re Duncan),* 331 B.R. 70, 77 (Bankr.E.D.N.Y. 2005); *Eavenson v. Ramey (In re Eavenson),* 243 B.R. 160, 164 (N.D.Ga.1999).